**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-CV-00644-NYW

HARRIS ELIAS,

      Plaintiff,

v.

CITY OF LOVELAND, a Colorado municipality,
OFFICER WILLIAM GATES, Loveland Police Officer, in his individual capacity, and
SERGEANT ANTOLINA HILL, Loveland Police Officer, in her individual capacity.

      Defendants.

---

**AMENDED COMPLAINT AND JURY DEMAND**

---

      Plaintiff Harris Elias, by and through his attorney Sarah Schielke of The Life & Liberty Law Office, respectfully alleges for his *Amended Complaint and Jury Demand* as follows:

## I.      INTRODUCTION

1.  The Loveland Police Department loves to brag about its DUI arrest numbers. They constantly point to their high DUI arrest statistics as proof that they need more funding, more officers, and more equipment. They are then, in fact, able to get more funding, more officers, and more equipment, as a result. As it happens, this is a scam. They have been padding their DUI arrest numbers by arresting and wrongfully charging innocent people with this horrific crime.

2.  Loveland's reckless pursuit of awards, money, and accolades for having the highest DUI arrest numbers has resulted in a culture at the department where it is an accepted pattern and practice to wrongfully arrest innocent citizens and charge them with DUIs.

3.  Plaintiff Harris Elias is one of the many victims of Loveland's corrupt and self-serving scheme.

4. Plaintiff brings this civil rights action pursuant to § 13-21-131, C.R.S. and 42 U.S.C. § 1983 and 1988 for various forms of relief, to include compensatory damages and attorneys fees, stemming from Defendants' violations of Plaintiff's rights guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States and Article II, Section 7 of the Colorado Constitution.

5. The Court has jurisdiction over Plaintiff's claims pursuant to § 13-21-131, C.R.S., § 13-1-124(1)(b), C.R.S., because the acts giving rise to the claims were committed in the State of Colorado, and pursuant to state court supplemental jurisdiction over the federal claims arising out of 42 U.S.C. § 1983.

6. Pursuant to C.R.C.P. 98(c)(5), venue is proper in this Court, which Plaintiff designates as the place of trial for this action.

7. Jurisdiction supporting Plaintiffs' claim for attorney's fees is conferred by 42 U.S.C. § 1988 and § 13-21-131(3).

## II.    PARTIES

8. Plaintiff Harris Elias is a resident of the State of Colorado. He resides in Fort Collins, Larimer County, Colorado presently and at all times relevant to this Complaint.

9. Defendant Loveland Police Officer William Gates ("Officer Gates") was at all times relevant to this complaint duly appointed and sworn as a police officer working for the Loveland Police Department. Officer Gates is a named Defendant in his individual capacity.

10. Defendant Loveland Police Sergeant Antolina Hill ("Sergeant Hill") was at all times relevant to this complaint duly appointed and sworn as a police officer working for the Loveland Police Department. Sergeant Hill is a named Defendant in her individual capacity.

11. Defendant City of Loveland is a governmental entity and municipality incorporated under the laws of the State of Colorado for purposes of liability under 42 U.S.C. § 1983 and the Loveland Police Department is a department of City of Loveland. Defendant City of Loveland enforces local and state law through its law enforcement agency, the Loveland Police Department ("LPD").

12. At all times relevant to this Complaint, Defendant City of Loveland employed and was responsible for the oversight, supervision, discipline and training of LPD personnel, including Officer Gates and Sergeant Hill.

13. Defendant City of Loveland was also, at all times relevant to this Complaint, the body responsible for LPD's official policies and practices as well as LPD's unofficial customs and practices with respect to DUI arrests and probable cause.

14. All of the events described herein occurred in the Cities of Loveland/Fort Collins and the State of Colorado.

## STATEMENT OF FACTS

15. On the evening of January 4, 2020, Plaintiff Mr. Elias was peaceably, lawfully and quite soberly driving to his home after having left his girlfriend's house in north Fort Collins.

16. Mr. Elias's girlfriend had hosted a dinner party that night, with several guests in attendance from 5-9 pm. They had had a wonderful time with great food and enjoyable conversation. After the guests left around 9-9:30 pm, Mr. Elias had helped his girlfriend clean up. Together they chatted, did dishes, and cleaned up leftovers.

17. At about 10:30 pm, Mr. Elias departed for home. It had been a great evening. As a single dad raising three kids, he rarely got much social time out. He was now happy, tired and full. And

he was also very much looking forward to rejoining his kids at their residence in southeast Fort Collins, and then going to bed.

18. Mr. Elias soon was headed south on College Ave through mid-town Fort Collins. There was little to no traffic anywhere around him.

19. Mr. Elias stopped at the red light at Drake. When it turned green, he continued driving southbound.

20. After driving approximately another half mile, Mr. Elias saw that the stoplight up ahead at the intersection with Swallow Road was red. He slowed for the red light. As he had nearly come to a stop, the light turned green and he began to slowly accelerate forward again.

21. Mr. Elias had been daydreaming and was also new to town. As a result, shortly after he crossed Swallow, he had a moment of wondering if he had missed the turn that he had intended to take east. He briefly removed his foot from the gas pedal to stop accelerating further, so that he'd be able to read the next cross-street's street sign and orient himself.

22. Mr. Elias read the next street sign and was reoriented. He had not yet missed his planned turn. However suddenly, in nearly the very same instant as he put his foot back on the gas pedal, he saw the headlights of a car speed up behind him and close in on his bumper in a startling, aggressive manner. Not wanting to impede the driver, whomever it was, he signaled a lane change with his left blinker to get out of the driver's way and in preparation for his upcoming left turn to head east. He made the lane change normally, lawfully, and without issue.

23. The car that had sped up behind him turned out to be Loveland Police Officer William Gates. Defendant Officer Gates was working in his role as a member of the recently formed "RAID" (Reduce All Impaired Driving) inter-police agency task force. Officer Gates was not in

Loveland. He was in midtown Fort Collins. And he had been that night roving the streets of Larimer County with the sole task of looking for and charging citizens with DUIs.

24. Officer Gates stayed tight on Mr. Elias's tail, following him into the left lane (and not signaling his own lane change as he did so). He then flipped on his overhead red and blue lights, initiating a traffic stop. Mr. Elias immediately submitted to the officer's show of authority, using his turn signal to promptly turn onto a well-lit side street. Mr. Elias made sure to also pull forward enough on the side street, before parking, to ensure that the officer stopping him had room to safely park behind him.

25. Officer Gates parked behind Mr. Elias, got out of his patrol car, and walked up to Mr. Elias's window. Mr. Elias had already rolled it down.

26. Officer Gates asked Mr. Elias how he was doing. Mr. Elias said he was doing well.

27. Officer Gates told Mr. Elias he stopped him because he "didn't signal his lane change." This was not true. Mr. Elias was skeptical of this claim and told Gates so.

28. Officer Gates often claims (falsely) that the drivers he arrests for DUI did not signal a lane change. Gates does so because this is one of the most difficult allegations to disprove, given that Loveland PD does not employ dash cams (only bodycams) and so their videos never capture the arrested individual's actual driving. "Failures" to signal are also often an offense of slight omission – when changing lanes, a driver need only blink their blinker once, even for just a millisecond prior to moving lanes, to comply. As a result, proving something this subtle and brief actually occurred can be (particularly at night) immensely difficult. Officer Gates counts on this reality.

29. At the time this arrest occurred, Officer Gates had been alleging drivers committed "failure to signal a lane change" more often than any other officer at LPD. He alleged it so often, and with

5

such noticeably greater frequency than any other patrol officer, that it ought to have caused any reasonable, responsible immediate supervisor to have had questions and concern about its veracity.

30. Officer Gates prides himself on having some of the highest DUI arrest rates in the State of Colorado. He is heard boasting about it to drivers he is arresting on his various bodycam videos. He has received awards and literal trophies from MADD (Mothers Against Drunk Driving) and his employing agency (Loveland Police Department) for having the highest DUI arrest numbers. At the time of this arrest, he was earning extra income as a result of his high DUI arrest numbers by virtue of those numbers gaining him overtime shifts (paid time and a half) to work DUI enforcement both for LPD and the RAID task force.

31. Grant funds obtained by the RAID task force are distributed to the member police agencies "according to the individual agency's percentage of impaired driving citations issued in the immediately preceding year." As a result, all of the participating agencies know to value quantity of DUI arrests over quality of DUI arrests.

32. The RAID task force also states in its formation documents that its objectives include "ensuring an appropriate level of media coverage" for each of the participating agencies to increase the funding and public support they receive.

33. The Loveland Police Department also earns more money for itself as a result of applying for DUI-enforcement grants. Through multiple grant programs, Loveland Police Department claims that impaired driving is a bigger problem in this part of Colorado than others (it isn't), which enables them to get the lion's share of DUI-enforcement grants and funds from CDOT (Colorado Department of Transportation). LPD then sends out officers like Gates to generate "evidence" of this DUI "problem" by racking up as high of DUI arrest numbers as possible.

Then, when it comes time to apply for more money to pay for more equipment and personnel the following year, LPD cites those DUI arrests numbers as proof of the need for more funding. The cycle continues indefinitely.

   a.  In 2018, the agency received approximately $30,000 in such funding for DUI arrests.

   b.  In 2022, following the formula laid out above, LPD's funding has ballooned to $237,000.

34. After Mr. Elias informed Gates that he was skeptical of the claim that he had not signaled his lane change[1], Gates added that he also stopped Mr. Elias because he was "doing 18 miles an hour in a 45 mile-per-hour zone."

35. It is not unlawful to drive 18 mph in a 45-mph zone.

36. Every single driver, accelerating into motion from a red light that has turned green, must at some point go 18 mph in a 45-mph zone. This is not a lawful basis to stop any motorist. Officer Gates knew it. Every reasonable officer would know it.

37. But that knowledge did not prevent Gates from hurling the claim at Mr. Elias as though it were a criminal accusation requiring his response and defense. Mr. Elias was stunned.

38. Quickly, and aiming to capitalize on Mr. Elias's taken-aback state by peppering him with further demands and accusations (with the hope that he could proclaim even the slightest resulting pause, delay, or confusion as another "observation" of DUI impairment) Gates nearly simultaneously demanded Mr. Elias's driver's license and insurance while also asking him how much he had to drink tonight.

---

[1] Mr. Elias, an FAA-licensed pilot and general contractor, is quite detail-oriented both in his day-to-day life and in his operation of vehicles. He was as sure as any person can be that he had in fact signaled his lane change and specifically recalled doing so.

39. Mr. Elias provided Gates with his license and proof of insurance immediately and without indication of impairment. In fact, he already had both documents ready and waiting for Officer Gates.

40. It was windy that day, however, and Mr. Elias had not heard Gates's question about drinking. He said, "What's that? I can't hear you." Gates repeated himself: "I said how much have you had to drink tonight?"

41. Mr. Elias was finding this entire encounter increasingly bizarre and concerning. He had committed no crimes nor even a traffic offense but had just been accused of multiple such offenses by this officer within just 30 seconds. He knew that his obligation was to provide license and insurance; he had done so. He knew that he had a right to remain silent and not be interrogated by such an obviously untrustworthy police officer; so now he did that as well. He told Officer Gates he was not going to answer his questions.

42. Officer Gates did not expect this. Typically, people fell apart from the speed and intensity of his abrupt criminal accusations. But Mr. Elias remained calm and collected. Even worse, Mr. Elias had perfect dexterity and speech. This DUI arrest that he had planned to make was not going how he intended it at all. Especially if Mr. Elias was going to exercise his right to remain silent.

43. Since Gates still intended to make the DUI arrest regardless, he knew he needed to fabricate more "evidence," and quick. So he next threw out the one and only other item that he could falsely claim and that Mr. Elias would be unable to disprove later. He responded: "Well, I smell the overwhelming odor of alcohol coming from your vehicle."

44. There was no odor of alcohol coming from Mr. Elias's vehicle, let alone an "overwhelming one."

45. Gates continued berating Mr. Elias, somewhat frenzied now: "And you're doing 22 miles an hour below the speed limit, and you failed to signal a lane change, so on a scale of zero being completely sober and 10 being the most intoxicated you've ever been, what do you feel like?"

46. It is worth noting that Gates first accused Mr. Elias of committing the non-crime of driving 18 miles per hour in a 45-mph zone. Now, seconds later, and contradicting his previous non-crime accusation, he was accusing Mr. Elias of committing the also-non-crime of driving 23 miles per hour in a 45-mph zone. In the very same breath, he was also ignoring Mr. Elias's invocation of his right to remain silent and attempting to continue an unlawful custodial interrogation of Mr. Elias without a *Miranda* advisement.

47. Mr. Elias responded to Officer Gates matter-of-factly: "That's irrelevant. I am not going to answer your questions."

48. At this point, Officer Gates's only lawful option was to let Mr. Elias go. Mr. Elias had committed no offenses (criminal, traffic, or otherwise) and he did not have probable cause to continue to detain Mr. Elias for anything else. But Officer Gates worked at the Loveland Police Department. And LPD had a custom for the treatment of any person who refused to submit to their authority and questioning: They would be arrested.

49. Here are just a few examples of that LPD custom from just a nine-month period surrounding Mr. Elias's arrest:

    a. On September 19, 2019, Preston Sowl was a good Samaritan who walked over to provide aid to a motorcyclist who had fallen over on his bike in the parking lot and injured himself. Officer Paul Ashe responded to the scene and decided he would interview Sowl about what happened. Sowl told him he hadn't seen the fall and didn't wish to be interviewed. Ashe told Sowl he could either answer his questions or be

arrested. Sowl knew this was unlawful and told him so. Pursuant to Loveland custom, however, because Sowl refused to submit to Ashe's questioning, now all force was authorized to arrest. Ashe, with two other LPD officers, promptly tackled Sowl and dislocated his shoulder arresting him. Their criminal case against Sowl was dismissed by the DA and Sowl sued the LPD for the wrongful arrest. LPD chain of command saw no problem with the use of force and approved of it as reasonable. Shortly after that, LPD gave Ashe the "Officer of the Year" Award.[2] The City settled the case in January 2020 for $290,000.

b.  On June 26, 2020, 73-year-old Karen Garner, who was suffering from dementia, walked out of a Loveland Walmart forgetting to pay for $13.88 in items. She gave the items back and began walking home, picking wildflowers as she went. Loveland PD officer Hopp responded to the scene and demanded Garner stop walking and talk to him. She shook her head no, shrugged, and continued walking home. Again, pursuant to Loveland custom and practice, this meant all force was authorized to arrest. Hopp promptly grabbed her, threw her to the ground, handcuffed Ms. Garner and arrested her. In the course of doing so, he and another officer broke her shoulder. LPD chain of command reviewed the arrest, saw no problem with it, and approved of it as reasonable. The City settled the case in September 2021 for $3,000,000.

c.  On July 13, 2020, Target contacted Loveland PD to check on a man (Keenan Stuckey) who appeared to be suffering from mental health issues in their parking lot. Loveland

---

[2] Officer Ashe has since been fired from LPD, apparently for trying to independently investigate the cover-up of the Karen Garner arrest that had been accomplished by command staff at LPD. Ashe is now suing the Loveland Police Department for that wrongful termination. *See Paul Ashe v. City of Loveland*, Larimer District Court case no. 21CV030907 (filed December 16, 2021).

PD sent six officers there in minutes. The first officer who arrived on scene demanded that Stuckey stop walking and talk to him to answer his questions. Stuckey ignored him. Pursuant to Loveland custom, this meant all force was authorized to arrest. The officer promptly told Stuckey he was under arrest and threw him to the ground. The other LPD officers who arrived joined him in brutalizing Stuckey with batons, kicking him, punching him, and even at one point doing a pile-driver type of jump atop his lifeless body. The chain of command at Loveland PD reviewed all the videos associated with this and approved of the arrest.

d. On May 16, 2020, LPD Officer Ashe contacted C.B. in a parking lot and said he could smell marijuana. C.B. told Ashe he did not want to be interrogated or answer questions. Ashe had observed no evidence of impairment (or even driving). However, since C.B. stated he would not answer questions, pursuant to Loveland custom, Ashe arrested him and charged him with DUI. Ashe later admitted under oath he did not observe a single indication of behavioral impairment ("not even to the slightest degree"), but believed he could arrest C.B. based on the odor of marijuana and his refusal to be questioned. The DA dismissed the case.

50. Since Mr. Elias was not going to be questioned, as was the Loveland way, Gates prepared to arrest him. He took Mr. Elias's documents back to his patrol car and called for cover officers. After 3 minutes, two officers from the Larimer County Sheriff's Office arrived. Officer Gates told them that Mr. Elias was refusing to answer questions so he "didn't know how this was going to go."

51. Officer Gates returned to Mr. Elias's driver side door and ordered him out of the car. Mr. Elias complied, turning off the car and rolling his window up as he exited.

52. Gates noticed that Mr. Elias had his phone with him which meant he could potentially be recording the encounter. He directed Mr. Elias to leave his phone in his car.

53. Officer Gates during this time regularly and prolifically violated LPD's written policy regarding when officers were permitted to mute their bodyworn cameras. It was a known practice of his to mute his camera while questioning arrestees, after which he would write in his reports all kinds of false statements regarding what was said during the time that he "accidentally" or "inadvertently" had muted his bodyworn camera or "forgotten" to unmute his bodyworn camera. Pursuant to this practice,[3] he would always attempt to separate subjects from their phones to reduce the possibility of their separately recording the exchange.

54. Mr. Elias complied with the directive and put his phone in the car, naturally growing increasingly wary and concerned as ever.

55. Mr. Elias is an FAA-licensed pilot. Being accused of or investigated for DUI is about as terrifying as it can get. Merely being arrested for DUI can result in the suspension or revocation of all the years of training, education, testing and medical clearances completed to obtain such a license.

56. Officer Gates directed Mr. Elias to the back of his vehicle. Mr. Elias complied, showing still not one indication of impairment.

---

[3] In fact, this constant muting/"forgetting" to unmute manipulation of recording devices practice was and is quite common at Loveland PD. Not all officers do it, but those who do, do so quite liberally because, upon information and belief, there has never been any consequence or repercussion at Loveland PD – ever – for violating their BWC policy via the repetitive muting and manipulation of bodycam recordings.

57. At the rear of the vehicle, and now having surrounded him with himself and two other officers, Officer Gates took another stab at interrogating the observably innocent Mr. Elias. He told Mr. Elias that his eyes were "bloodshot, watery, glassy."

58. Mr. Elias's eyes were not "bloodshot, watery, or glassy." To this end, Mr. Elias throughout his encounter later into the night with Officer Gates repeatedly requested that Gates take a photograph of his eyes to document the fact of the false allegation.

59. Officer Gates continued: "So, how much have you had to drink?"

60. Mr. Elias told Officer Gates again: "I am not going to answer any questions."

61. Gates replied: "Ok. Would you want to do some voluntary tests for me?" Mr. Elias responded: "No sir."

62. Officer Gates then told Mr. Elias to turn around, put his hands behind his back, and that he was under arrest for DUI.

63. At the time he formally arrested Mr. Elias, Officer Gates did not have probable cause to arrest him for DUI. He also knew it. He just didn't care.

64. Officer Gates knew that LPD valued his DUI arrest numbers far more than the quality of any of his DUI arrests. He had also wrongfully arrested numerous people prior to this for DUI. At least 4 in just the previous year alone. In each case, he had falsely claimed "overwhelming odor of alcohol" and "bloodshot watery eyes" only to see test results indicating zeroes.

65. Gates's supervising officers at LPD were aware of his wrongful DUI arrests. But they took no corrective measures whatsoever. They instead continued to reward him for the quantity of DUI arrests he made over all else.

66. Gates knew that increasing his DUI arrest numbers remained the top priority to his own ego and career as well as to his employer, and so he proceeded accordingly.

67. Officer Gates invoked Colorado's Express Consent law and demanded that Mr. Elias submit to a chemical test of his blood or breath.

68. Mr. Elias asked Gates to explain the process for each of the two types of test. Given what he had just witnessed from Gates so far, Mr. Elias was very concerned about which test would be more vulnerable to tampering or falsification on Gates's part.

69. Given that he was innocent and a breath test would provide incontrovertible proof of that far sooner than a blood test, Mr. Elias elected a breath test.

70. Officer Gates transported Mr. Elias back to the Loveland Police Station to conduct a breath test.

71. Mr. Elias completed a breath test. The result was 0.000% BAC.

72. Officer Gates was undeterred. He had already wrongfully arrested Mr. Elias, why would he stop his unlawful fishing expedition now? It had never stopped him before (see *infra*). And he knew quite well that it also had never stopped his supervising sergeant, Sergeant Antolina Hill. So he muted his microphone and then went and told some of the other LPD officers standing around what he was going to do next. One of them laughed and came over to watch.

73. Officer Gates unmuted his microphone and then returned to the room where Mr. Elias was waiting. He told Mr. Elias that he now would need to take a blood test.

74. Mr. Elias was incredulous. He told Officer Gates that he had just complied with Colorado Express Consent. He had just literally proved his innocence. Why would he now need to do a blood test?

75. Officer Gates began babbling nonsense explanations. This included him stating that he had "reasonable suspicion to arrest" Mr. Elias for DUI (which is categorically insufficient under the Fourth Amendment and Colorado Constitution, it's *probable cause* that's required – and

he didn't have that either) and that since Mr. Elias had blown zeroes, he now could demand a blood test.

76. Mr. Elias requested an attorney. Gates told him no, that he needed to agree to comply with a blood test now or he was going to mark him as a refusal and his license would be revoked.

77. It is worth noting here that Officer Gates was at the time of this arrest trained and certified as a "Drug Recognition Expert." "Drug Recognition Experts" claim that they can detect, discern, and differentiate the different types of impairments caused by various recreational drugs and medications.

78. Officer Gates was making no such attempts at discernment now, however. This was a fishing expedition, plain and simple. He knew from his own experience that most adults were on some kind of medication, or had at some point recently used some kind of drug, lawful or otherwise. Mr. Elias had refused his questioning, which was an indignity that no Loveland Police Officer tolerated. And so Officer Gates was going to just search and seize Mr. Elias until he found something to arrest him for. Or, Gates would behave so unlawfully that Mr. Elias would be provoked into some form of anger or outrage that he could charge him with Resisting Arrest or Obstruction for. Everyone at Loveland Police Department knew that was how they did things in this situation.

79. Mr. Elias had not consumed any kind of drug or medication, however. Nor was he going to be provoked into any kind of behavior that could be misconstrued as resistance or obstruction. He continued to grow more and more sick, however, as he realized that his observable compliance and obvious sobriety would not here be enough to overcome Gates's determination to destroy his life.

80. At the hospital, now more than 2 hours into this unlawful seizure, Mr. Elias's panic grew. If Gates were permitted to take the vial of his blood out of sight, couldn't he just switch the vial with someone else's? He asked Gates to explain how the integrity of the test and the vial would be ensured. Gates grew angry, aggressive and petulant with Mr. Elias. He told him to sign the form to do the draw or he was going to mark him as a refusal and revoke his license.

81. Mr. Elias was under great stress. He told Gates so. Specifically, he told him: "I am under stress. My freedom is at stake, sir." In response, Gates mocked him.

82. Mr. Elias requested that a second vial be drawn for him to have tested at an independent lab. Gates ridiculed him some more, telling him that one of the vials *was* for the defense to have independently tested, as though this is something Mr. Elias would have otherwise known. He told Mr. Elias that he needed to stop "playing this game" and that he was going to just revoke his license for a refusal. Mr. Elias – terrified, exasperated, completely innocent, alone, in distress and still in the custody of this plainly lawless police officer – responded, firmly: "I am *not* playing a game, sir. **This is my freedom we are talking about**."

83. Gates told Mr. Elias to quiet down. Gates (still trying unsuccessfully to bait Mr. Elias into getting upset enough to be charged with obstruction) then further tried to escalate matters by falsely accusing Mr. Elias of "threatening" the nurse.

84. Mr. Elias had not threatened anyone. Still, he was further reminded in this moment of Gates's complete control over his life, his livelihood, his freedom, and his future. So despite having done nothing wrong, he apologized. Then he agreed to sign the form for the blood draw.

85. Officer Gates removed only one of Mr. Elias's hands from the handcuffs to sign the form – Mr. Elias's left hand (Mr. Elias is right-handed). Mr. Elias signed the form to the best of his ability with his non-dominant hand.  The nurse took two vials of his blood.

86. Officer Gates put both of Mr. Elias's hands back into handcuffs and transported him back to the Loveland Police Station booking area. He told him the only way to avoid being taken to the jail for the rest of the night was if he could find a sober driver to pick him up.

87. Sergeant Hill was at the station now too. She asked to know what was happening with Gates's DUI arrest. They muted their cameras and went into a side room where the surveillance cameras would not be able to capture their conversation. There, they began whispering to one another. Gates told Hill that Mr. Elias had blown all zeroes, so he made him do a blood test to see if he could get him for any medications or something else that way. Hill nodded in agreement. This is exactly what she did in this situation too. Never give up the DUI arrest, just keep fishing. Both knew that Loveland/Ticer rewarded DUI arrest numbers and had literally never once punished a wrongful DUI arrest.

88. Hill was Gates's supervising Sergeant and he looked to her for confirmation and direction. He both copied what she did (Hill was referred to as the "queen" of DUI arrests within LPD) and hoped to, with enough such copying and emulation, attain equal status to her (as it happens, Gates was referred to as the "king" of DUI arrests within LPD). Together, Hill and Gates had more annual DUI arrests than the rest of the Loveland Police Department combined. Loveland/Ticer and Loveland chain of command openly praised this. When they learned that dozens of these arrests were wrongful DUI arrests, they did absolutely nothing.

89. At this moment, Hill could have told Gates to release Mr. Elias and not charge him with DUI, given that he had blown zeroes and there was no evidence of any other drug. She was his supervising sergeant and had command authority over him. But she didn't. She didn't care. And with how many wrongful DUI arrests she herself was making during this time (see *infra*) it sure wouldn't hurt if some other LPD officers were making their own too.

90. Hill then assisted Gates in writing his report of this arrest and approved of it as his supervisor.

91. It was now 2:00 am in the morning. Humiliated, terrified, and helpless, Mr. Elias began calling his children and his girlfriend to try and obtain a ride.

92. Mr. Elias has always had a zero-tolerance policy with his children and impaired driving. His three teenagers have known forever that he would not tolerate that from them, and now here he was calling them from jail after having been arrested for that very charge. It was the lowest, sickest feeling he had ever felt.

93. Mr. Elias's girlfriend had young children. He knew that by calling her for a ride, if by chance she answered, she'd have to find someone in the middle of the night to watch her kids while she went to pick him up. The mortification continued and expanded.

94. After several attempts, Mr. Elias was able to reach his girlfriend who then called her neighbor to come over and watch her kids while she drove to jail to pick him up. He knew this meant that all of her friends and extended group would find out. The humiliation continued.

95. Adding to the dehumanization and utter humiliation, Mr. Elias was locked in a cell to use the bathroom and wait for his girlfriend to arrive.

96. Mr. Elias's girlfriend finally arrived. She was clearly tired, confused, and stressed, after having had to wake a neighbor to have them watch her kids while she dealt with the deeply embarrassing task of picking up her now-DUI-charged boyfriend from the police station.

97. Once in the car, Mr. Elias's head continued to swim. After what he had just seen Gates do, and the lies Gates had told in order to arrest him, how could the testing done on his blood now in Gates's sole possession ever be trusted?

98. Mr. Elias asked his girlfriend to drop him off at a hospital so that he could get an independent test of his blood. She did so.

99. At the hospital, Mr. Elias spent about an hour waiting for an attending doctor to talk to him about his rather odd middle-of-the-night request for an independent blood test. During his wait and after talking with members of hospital staff (who indicated it was unlikely they could provide this type of service), he decided to call other hospitals in the area to obtain such a test. No luck. After further long wait, a doctor came out and told Mr. Elias that they could not provide him with the blood test he requested.

100.   Mr. Elias walked home from the hospital, defeated, devastated, and humiliated. He then began the long, horrible wait for the results of the blood. Every night he laid awake wrought with fear and anxiety that Gates would find a way to tamper with or alter the results. And if he had succeeded in doing so, that would be the end of his career, his relationship, his respect as a parent, his pilot's license, and his livelihood.

101.   For two months, this harrowing wait went on. During these eight horrible weeks, Mr. Elias spent significant time, funds, energy, and stress on trying to prepare for his worst fears, seeking an attorney to represent him and a hiring investigator assist him in preparing to overcome whatever lies Gates attempted next.

102.   Mr. Elias's sleep was disrupted. He became depressed and worried constantly about what horrific (previously unimaginable to him) wrong LPD would inflict upon him next to cover up what they had done.

103.    On March 2, 2020, finally, the blood results came back. Negative. For everything.

**Involved Subjects**

Suspect:   Harris Xavier Elias Jr.                    DOB:   10/04/1971          SID:

| CBI Item #: | Agency Item #: | Description of Evidence: |
|---|---|---|
| Item 1 | 1 | TOX Collection Kit |
| Item 1.1 | | Gray top vial with blood |
| Item 1.2 | | Gray top vial with blood |

**Results/Opinions and Interpretations:**

Item 1.1

| Drug | Result | Method |
|---|---|---|
| Ethanol/Volatiles | Not Detected | HS-GC/FID |
| Drugs of Abuse Screen | Not Detected | ELISA |

104.    Like all DUI case blood test results, Mr. Elias's blood test results were reported to Loveland

Police Department directly before being sent to the district attorney.

105.    On March 3, 2020, the Larimer County Court dismissed the case against Mr. Elias in its

entirety.

106.    Mr. Elias's nightmare was not over yet, and actually never will be. Because he is an FAA-

licensed pilot, Mr. Elias also suffered unique additional harms, in the form of the FAA opening

an investigation into and initiation of proceedings against one of Mr. Elias's most prized

possessions/accomplishments – his pilot's license.

107.    The FAA (Federal Aviation Administration) has some of the most strict mandatory

reporting requirements known to any agency. The penalty for failure to report can lead to an

emergency revocation of all certificates (i.e., complete revocation of his pilot's license). In the

months that followed (and well into the next year), Mr. Elias had to dedicate inordinate time

and stress in speaking with experts in this field to figure out how and whether to report the

arrest. An FAA investigator would eventually direct him to notify the FAA of the arrest, even

though the case had been dismissed, in an abundance of caution due to the severity of the

sanction for failure to report.

108.    This triggered numerous weighty and stressful consequences for Mr. Elias with the FAA. When renewing his pilot's license in February 2021, he was required to report the arrest and the FAA refused to renew his license until he provided: (1) copies of the police reports and blood/breath tests; (2) complete copies of all court records associated with the offense; (3) all records related to any care, treatment or assessments for any alcohol abuse or related disorders in his entire life; (4) a detailed statement from Mr. Elias regarding his "past and present patterns, and future plans of alcohol use and of the circumstances surrounding all of [his] offenses"; (5) a complete copy of Mr. Elias's driving record from any state in which he has held a driver's license for the past decade; (6) a written statement from Mr. Elias explaining why he did not submit to roadside tests; and (7) complete medical records from when Mr. Elias had previously decades earlier sustained a head injury. The process for obtaining and producing these documents was expensive, stressful and took several months.

109.    As a result of Defendant Gates's knowingly wrongful and false arrest of Mr. Elias and Defendant City of Loveland's failure to supervise Gates, as well as their promulgation of such unlawful customs/practices as arresting people for remaining silent and openly valuing quantity of DUI arrests over quality/lawfulness of DUI arrests, Mr. Elias will have to report this wrongful arrest on every medical renewal with the FAA for the rest of his life (Question 18V on the medical form), and explain it anew. All of the records that Mr. Elias had to submit as listed above are now a permanent part of his airman medical file. The consequences of this are innumerable, to include foreclosure of career paths, jobs, increases to insurance rates, embarrassment and heightened scrutiny. This particular component of the damages caused by the Defendants continues to, and will forever, cause Mr. Elias humiliation, sadness, and distress.

110.    Loveland Police supervisory staff, including Chief of Police Robert Ticer, were aware of Defendant Officer Gates's propensity for wrongful DUI arrests and did nothing about it.

111.    Loveland Police supervisory staff, including Chief of Police Ticer were aware that its officers regularly arrested people for merely refusing to be questioned. Because this was pursuant to a known custom/practice at LPD, no one did anything to stop it.

112.    As a result of the Defendants' violations of his constitutional rights under both the U.S. and Colorado Constitutions, Plaintiff has suffered damages, trauma, depression, and suffering that has destroyed his ability to work, caused lost wages and devastated his enjoyment of life.

### CHIEF TICER AND LPD'S OBSESSION WITH DUI ARRESTS

113.    Officer Gates began his law enforcement career in Northern Colorado by getting a job at the Greeley Police Department in 2016. This is not where he wanted to work, however. He very much wanted to work as a police officer in Loveland.

114.    In his first year at Greeley PD, Officer Gates had just 16 DUI arrests. He knew from all of Ticer's public statements boasting about DUI arrest numbers that he needed to get more than that if he was going to be hired by Loveland.

115.    So in his second year at Greeley PD (2017), Officer Gates amped it up. He more than doubled his previous year, with 40 DUI arrests.

116.    These are the types of DUI arrest numbers that got the attention of Chief Ticer at Loveland Police Department. Officer Gates applied for the lateral move to LPD and was hired.

117.    Officer Gates hit the ground running at LPD with prolific DUI arrests. In 2018, he had over 50 DUI arrests. In 2019, he more than doubled that, with over 130 DUI arrests. In 2020 – astoundingly, given that COVID pandemic restrictions closed down all bars and events for

most of the year, keeping the population at home and not driving – Gates maintained these absurdly elevated DUI arrest numbers, with over 110 DUI arrests.

118.   Gates's supervisors and Chief Ticer in particular could not have been happier with Gates's volume of DUI arrests. They commended him in front of others, they gave him raises, they gave him special higher-paying overtime shifts, they gave him literal awards. Ticer kept track of and posted Gates's DUI arrest numbers publicly alongside all the other patrol officers' numbers to encourage competition and to ensure the volume of DUI arrests remained as high as humanly possible.

119.   During this time, Gates's supervisors (Sergeant Antolina Hill and Chief Ticer in particular) learned that some of Gates's DUI arrests were actually *wrongful* DUI arrests. That is, the blood and breath test results coming back for some of these people he had arrested were zeroes for the alcohol that Gates was every single time in his reports proclaiming there to have been an "overwhelming odor" of.

120.   Chief Ticer and Sergeant Hill did not care about these poor innocent people Gates was victimizing without consequence. And why would they? They were both also making their very own wrongful DUI arrests during this time. Even Chief Ticer himself assisted Hill with arresting and charging an innocent person with DUI, by providing a DRE evaluation of the individual (see *infra*) and declaring in his (Ticer's) "expert" DRE opinion that the person was under the influence of cannabis.

121.   Sergeant Hill, meanwhile, Gates' direct supervisor, *was even more prolific with wrongful DUI arrests of innocent individuals than Gates was*. Dozens of innocent people were arrested by Hill and charged with DUI, only to have test results again and again come back all negative.

122.    Chief Ticer knew this was going on and encouraged it. There were no consequences to him for LPD's pattern of wrongful arrests of innocent individuals. But having some of the state's highest per capita DUI arrest numbers? That would ensure not *just* more funding for his department, but more accolades and bragging rights for him at all of his various anti-impaired-driving/impaired-driving-enforcement groups, events, clubs and awards ceremonies.

123.    Chief Ticer began as Chief at Loveland Police Department in June 2016. Ticer came from the Avon Police Department, where he had just been chief for 6 years. Prior to that, he worked in Arizona on their Highway Patrol for two decades.

124.    When not defending his officers against multiple/repeated allegations of excessive force, Chief Ticer appears to dedicate most or nearly all of his time in the public realm to discussing arrest numbers and insisting that more police and funding is needed to combat impaired driving. Ticer also promotes himself and his department by regularly appearing in promotional videos for MADD's website.

125.    Chief Ticer was and is the Chair of the "Colorado Task Force on Drunk & Impaired Driving." The CTFDID meets every month to talk about, among other things, impaired driving arrests in Colorado and ways to direct funding into law enforcement to reduce impaired driving.

126.    Coincidentally, this enables Chief Ticer to be at the forefront of lobbying for various forms of monetary grants and awards to be established which he can then obtain for his own police department. He does so.

127.    Chief Ticer is also the Chairman of the "DRE Technical Advisory Panel" which makes his certification as a DRE expert, and use of the same to make his own wrongful DUI arrests, particularly insidious.

128.    Chief Ticer is also deeply intertwined with MADD (Mothers Against Drunk Driving) and their leadership. He emphasizes aggressively and persistently to his patrol officers that DUI arrests numbers (along with any form of arrest/enforcement action generally) are a priority over any other form of helpful community policing.

129.    This policy on Ticer/Loveland's part has resulted in a pattern of high-profile horrific arrest events ending in public outcry and civil lawsuits.

130.    One such high-profile horrific arrest event was that of Karen Garner, a 73-year-old woman with dementia, who on June 26, 2020 was arrested and seriously injured by multiple Loveland officers and sergeants for walking out of a Walmart after forgetting to pay for $13.88 of items. She was then brought back to the station, handcuffed to a bench in a jail cell, and denied medical care for several hours while numerous Loveland police officers, including Sergeant Antolina Hill, laughed about her misfortune, rewatched videos of her shoulder being dislocated, and discussed how to cover up what they had done to her.

131.    This event led to a lawsuit, international condemnation, and a $3,000,000 settlement paid by Loveland to Ms. Garner.

132.    Multiple investigations were opened into the LPD following this incident. Pursuant to those investigations, it was discovered that Chief Ticer and his immediate subordinate lieutenants were aware of the Garner arrest and her injuries and had both lied about that knowledge and helped to cover it up.

133.    One of the "investigations" that was done as a result of the Garner event was an "investigation" by outside agency Jensen Hughes into Loveland's general patterns and practices in policing.

134.    Jensen Hughes's business is providing these reports to law enforcement agencies embroiled in scandal. The cities that pay JH hundreds of thousands of dollars to conduct such "investigations" typically are eager to appear to be "doing something" about the scandal bringing negative public attention to their police agencies, but the cities naturally also do not want JH to actually provide an inventory of any other serious issues.

135.    Because Jensen Hughes needs to maintain its business and secure future contracts from other law enforcement agencies, they go out of their way to surround their findings in their reports following these "investigations" with vague compliments and encouragements and generalized "best practices" recommendations that could apply to any police department.

136.    Despite the resultant extraordinarily anemic nature of these JH "reports," after they completed their investigation into LPD's policing practices in 2021, JH identified and mentioned (repeatedly) the problems and toxic culture that were observably present at LPD related to LPD's preoccupation with arrest numbers over all else.

137.    For example, from the report:

**Focus on Citations**

The LPD's implementation of DDACTS creates a culture focused on traffic enforcement and DUI arrests. Many interviewees told us that although the LPD does not have an official quota system, the Department expects officers to engage in 10 activities per day with an emphasis on traffic stops in DDACTS zones. To be clear, the Department does not expect every traffic stop to result in a citation. However, this emphasis on data creates a culture of officers accumulating arrests and traffic citations

**Teamwork**

The LPD's implementation methods of DDACTS reduces teamwork and leads to competitiveness among officers, as disagreements sometimes occur regarding the credit officers receive for certain actions. For example, an officer may avoid responding to calls that may only require the completion of an incident report so they can be available to make traffic stops. Additionally, the focus on data causes officers to spend as little time as possible assisting other officers because they need to ensure that they meet their daily expectation of ten activities. Spending less time on calls for service wherein officers are encouraged to take time to speak with a citizen can result in the community perceiving that LPD officers do not care about residents' issues.

138.   Some other highlights from the JH report:

a.   "The LPD's implementation of DDACTS creates a culture focused on traffic enforcement and DUI arrests. Many interviewees told us that although the LPD does not have an official quota system, the Department expects officers to engage in 10 activities per day with an emphasis on traffic stops in DDACTS zones."

b.   "This emphasis on data creates a culture of officers accumulating arrests and traffic citations rather than engaging in other quality policing activities."

c.   LPD's culture and practice of demanding its officers focus on increasing DUI arrests "incentivize[s]" officers to "generate numbers through tickets, arrests, and handling traffic crashes.

d.   "Our interviews indicate that most of the Department's overriding policing philosophy revolves around data-driven policing (i.e., the DDACTS), rather than a philosophy based on community engagement and community policing."

e.   "However, as we heard repeatedly during officer interviews, most officers reported that they have not received formal guidance on working with the community. They feel as though the Department is understaffed and that they are pressured to generate numbers pursuant to DDACTS and therefore do not have the time to work on community policing activities. … They report that the LPD does not recognize or reward community policing activities like it does for enforcement activities."

f.   "Our interviews with LPD staff revealed that they would like to be more involved with community members and community organizations, but do not have time to engage in these activities or problem solving **because of the Department's emphasis on its**

**data-driven strategies and the need to produce daily numbers of enforcement actions**."

139.   Because Loveland has this policy and custom of rewarding arrest numbers over all else (with no consequences whatsoever for wrongful arrests – in fact, with instead having the assistance of leadership to *cover up* wrongful arrests), it is a foreseeable and likely result that innocent people like Harris Elias would be wrongfully arrested and charged with DUI.

140.   In fact, (see *infra*), Mr. Elias was just one of many in a long line of ongoing, recurring, wrongful DUI arrests being made by Gates and his supervisor, Sergeant Antolina Hill, at the LPD.

141.   Loveland was aware of the wrongful DUI arrests being made by Gates and Hill during this 2018-2020 period. Rather than intervene to stop their repeated violations of innocent citizens' rights, it rewarded the behavior with promotions, raises, awards, commendations, and praising them both for their record-breaking DUI numbers in front of the rest of LPD staff.

142.   Even if Loveland were unaware of the customs/practices and civil rights violations resulting from its obsessive "informal quota" arrest requirements, it certainly was aware that officer Gates and Sergeant Hill were arresting innocent people. Indeed, Ticer himself had personally assisted on at least one of those wrongful arrests.

**THE WRONGFUL DUI ARRESTS BORNE OF LPD'S DUI ARREST OBSESSION**

143.   The more public scrutiny there is on the Loveland Police Department, the more difficult it has become to get them to comply with Colorado Open Records Act ("CORA") requests.

144.   Prior to the negative public scrutiny that Loveland was facing, undersigned counsel was able to make records requests seeking (for example) copies of all the DUI arrest report

narratives authored by Officer Gates in a calendar year for a normal cost (in 2018-19, it was ~$400 for about 100 reports).

145. Loveland has responded to the negative public scrutiny brought upon its unconstitutional patterns and practices by Plaintiff's counsel over the past year by trying to prevent her access to the documents needed to support such claims. They do this by radically escalating their fees for each successive CORA request to prevent access to public documents that would provide the support needed for similar civil claims.

146. For example, Loveland charged Plaintiff's counsel $1,709 to provide copies of Gates' DUI reports in 2021. Each successive request gets deliberately prohibitively more expensive.

147. Loveland is currently embroiled in litigation with multiple other individuals (including its own mayor) for its obfuscatory efforts to refuse to provide public records and its pattern of making it exceedingly more difficult and costly for citizens to obtain public records. See, e.g., Larimer County District Court Case 21-CV-148, *Stacy Lynne v. DeLynn Coldiron, Loveland City Clerk*, and Larimer County District Court Case 22-CV-30110, *Loveland v. Jacki Marsh, Mayor of Loveland*.

148. As a result of these oppressive efforts, Plaintiff naturally does not have a complete picture of the volume of wrongful DUI arrests at LPD. However, after spending literally thousands of dollars to obtain some records through CORA requests (which are still very incomplete), Plaintiff certainly has a decent one.

149. Another issue precluding Plaintiff from having comprehensive documentation of the full extent of the unconstitutional practices/customs surrounding wrongful arrest at LPD is due to Colorado's laws regarding sealing. Under Colorado law, if a defendant's criminal case is

dismissed, they may file a petition and pay $65 and then the Court will order their arrest records to be sealed (destroyed).

150.    As a result, when people are wrongfully charged with DUI and their blood results come back showing they were so wrongfully charged and the DA's office dismisses the case, the vast majority of these people then (desperate to try and reduce the damage inflicted upon their lives by the wrongful arrests and baseless criminal charges) file petitions to seal which results in the destruction of those records at LPD.

151.    The only wrongful arrest records accessible to Plaintiff through CORA requests, then, are those individuals whose cases were dismissed *and who also did not know they could seal their case* (or could not afford it). This is necessarily a small demographic because Larimer County judges as a matter of policy *expressly advise* Defendants whose cases are dismissed that they can seal the case file and arrest records by filing a petition and paying a $65 fee.

152.    Despite these limitations,[4] Plaintiff has abundant specific instance proof of LPD's pattern of civil rights violations when it comes to wrongful DUI arrests. Here are literally just *some* of Sergeant Hill's and Officer Gates's bad DUI arrests from just the past few years:

---

[4] Often when individuals are wrongfully accused of and arrested for DUI by LPD officers, they also (not trusting the officer demanding a test) refuse to complete any testing. Due to how invested the officer appears in arresting the person despite their innocence, the false accusations the officer is making, and the abuse of power being witnessed, these people reasonably are concerned that doing a test will produce a tampered-with result. These individuals look completely normal on camera and are regularly arrested at LPD by Gates and Hill based solely on the false allegation of "odor of alcoholic beverage" or "bloodshot watery eyes." Many of these types of "refusal" cases are also then later dismissed by prosecutors due to being devoid of actual evidence of impairment. While these "refusal" cases are still wrongful DUI arrests and very much a part of the pattern described above (and there are at least 6 instances in the past 3 years that Plaintiff's counsel alone is personally aware of), for the sake of time and quantity of pages, none have been listed in the handful of examples provided here.

153.    On August 27, 2018, Defendant Officer Gates stopped a truck for "not having a front plate affixed to the vehicle." The driver, H.P.,[5] had a passenger who smelled like alcohol and who admitted she had been drinking.

    a.    H.P. told Gates he had not been drinking recently and showed no signs of impairment. Gates ignored these realities and arrested him for DUI anyway.

    b.    H.P. did a breath test which came back at .02. Gates charged H.P. with DUI anyway. The DUI charge was later dismissed.

154.    On October 23, 2018, LPD Sergeant Antolina Hill pulled over a driver for going what she described in her report as "a high rate of speed" (this, it turned out, was 41 mph in a 30 mph zone). The driver, D.T., told her that 30 mph is not what his Google Maps was reporting the speed in that area to be. He showed her his cell phone with Google Maps reporting that the speed limit was in fact 45 mph. Sergeant Hill told D.T. that the speed had just been lowered for upcoming construction.

    a.    Hill interrogated D.T. about alcohol use, drug use, and prescription medications. D.T. told her he did not use any of those items. Hill told D.T. that his eyes were droopy. D.T. explained that he had a damaged optic nerve that caused this to occur and was under the care of a neurologist. Hill ignored these statements and focused on getting her DUI arrest.

    b.    D.T. cooperated with all of Hill's tests. She took him for a blood draw and then drove him back to the station. She asked him if he would submit to a Drug Recognition Evaluation conducted by a Drug Recognition Expert (DRE). He said sure.

---

[5] Because these wrongfully arrested individuals are victims, Plaintiff is using their initials in these public pleadings rather than their full names.

    c.  The Drug Recognition Expert conducting the DRE was none other than Chief Robert Ticer himself. D.T. first did a breath test which revealed all zeroes. Undeterred, Chief Ticer then ran D.T. through the DRE protocol. While Ticer was doing the DRE, D.T.'s mother called the station and told the officers that D.T. was under the care of a neurologist and did not use any drugs or alcohol. Hill took the call. She told Ticer. They did not stop in their wrongful DUI arrest of D.T.

    d.  Chief Ticer, the Drug Recognition "Expert" issued a formal DRE expert opinion opining: "It is my opinion as a certified DRE that [D.T.] was under the influence of cannabis and could not operate a vehicle safely."

    e.  Ticer and Hill charged D.T. with DUI and released him to his mother.

    f.  Months later, D.T.'s blood came back negative for everything. The charges were dismissed by the DAs office.

155.  On April 6, 2019, M.H. was stopped by Defendant Officer Gates for "failure to signal." Gates claimed in his written report that he could immediately smell "the odor of an unknown alcoholic beverage" coming from M.H. Gates claimed that M.H. failed all of the Standardized Field Sobriety Maneuvers, to include getting "4 out of 6 clues of impairment" on the allegedly scientific Horizontal Gaze Nystagmus test, indicating a BAC over .08.

    a.  M.H. told Gates that he was making a mistake and Gates ignored him, fixated on adding another DUI arrest to his tally. M.H. consented to a blood test. Gates charged him with DUI.

b. Months later, the blood results came back. Negative for everything.[6] The DAs office dismissed the case.

156.   On September 21, 2019, L.E. was working as a Lyft driver, literally in the middle of driving two impaired passengers home (and thus actually making the roads safer and actually reducing impaired driving). Sergeant Hill was patrolling and bored. Just the previous month, the "Northern Colorado Reduce All Impaired Driving Task Force" had been formed and unleashed upon Larimer County, with her (Sergeant Hill) named the supervising Sergeant to this "Task Force," on account of her having by far the most DUI arrests of any other officer in the county. She was eager to prove herself deserving of this title – but she hadn't gotten a DUI arrest yet that night. Hill was not going to let her Chief down (Chief Ticer was, incidentally, also the "Program Director" in charge of the entire inter-agency RAID task force) by doing a whole shift and not adding to her DUI arrest stats. In fact, ideally, since there was a concert at Thunder Mountain that night, she was hoping she could squeeze in at least two DUI arrests in one shift. But this meant she would need to get at least one DUI arrest under her belt before the concert let out. She headed towards Crossroads Boulevard to see if there were any early departures.

a. There was one. She saw L.E. drive by and one of his headlights was a little dim. Good enough for Hill. She pulled him over.

b. Quite obviously there was an odor of alcohol coming from L.E.'s car because he was driving two drunk people home pursuant to his job as a Lyft driver.

---

[6] It is worth noting that every time blood results come back, the arresting officer receives the results directly and drafts a supplemental report into the case to log the results. So it is not like these wrongful DUI arrests are happening without Gates's, Hill's, or Loveland/Ticer's knowledge. They all have direct knowledge, and they simply do nothing.

c.  Rather than describe what happened next in this case, it is actually worth including

some of the passages from Hill's report itself, as this is a perfect illustration of the exact

pattern and procedure used at LPD for wrongfully arresting and charging innocent

people with DUIs that Gates employed on Plaintiff Mr. Elias in the instant case:



I contacted the driver and identified myself. I explained the reason for stop. The driver, who was later identified as ▆▆▆▆▆▆▆▆▆▆ 04/04/71, told me he was unaware the light was out. I asked ▆▆▆▆▆ for his driver's license, registration, and proof of insurance. ▆▆▆▆▆ handed me his driver's license and insurance card, but fumbled through several documents looking for the registration. I could see that ▆▆▆▆▆ had several copies of his registration in his hand. I told him that he had the registration in his hand. ▆▆▆▆▆ then stated that he was looking for the recent copy. While I was talking with ▆▆▆▆▆ at the driver's door, I could see that he had bloodshot watery eyes. There was a strong odor of an alcoholic beverage emitting from within the vehicle.

▆▆▆▆▆ had two passengers in the rear seat of his car. I asked them where they were coming from. They told me that they had just left the concert at Thunder Mountain. At this time, I saw the Lyft sticker on the right lower corner of ▆▆▆▆▆ vehicle and confirmed with him that he was driving for Lyft. I requested an additional unit respond to my location. Once ▆▆▆▆▆ provided me with his registration, I returned to my patrol car to complete a records check on his driving status. ▆▆▆▆▆ license showed that he was clear and valid.

At approximately 2215 hours, Officer D. Maddalena arrived at my location. I re-approached ▆▆▆▆▆ vehicle on the driver's side and Officer Maddalena approached on the passenger side. I asked ▆▆▆▆▆ to step out of the vehicle to speak with me. He agreed. Once we were at the rear of the vehicle, I asked ▆▆▆▆▆ how much he has had to drink tonight. He told me that he had not anything to drink and that he was "very sober." I asked ▆▆▆▆▆ if he would be willing to complete voluntary roadside maneuvers to determine if he was safe to drive. ▆▆▆▆▆ agreed.

Prior to having ▆▆▆▆▆ complete the maneuvers, I asked him if he is currently taking any prescription medications. He said, "No." I asked him if uses Cannabis in any form and he said, "No." I asked him if he wears contacts or glasses. He again said, "No." I asked him if he had any physical impairments that would prevent him from completing the maneuvers. He said, "No."

I explained and demonstrated each maneuver for ▆▆▆▆▆ prior to asking him perform them. After each instruction, I asked ▆▆▆▆▆ if he understood. Each time he said, "Yes." ▆▆▆▆▆ did not complete the maneuvers satisfactorily. Please see the attached impairment report for further. At the completion of the roadside maneuvers, I asked ▆▆▆▆▆ again how much he had to drink. He told me that he had zero. I asked him when the last time he smoked marijuana was. He told me it was three years ago. I explained to ▆▆▆▆▆ that I did not feel he was safe to drive and advised him that he was under arrest. I placed ▆▆▆▆▆ into custody without incident. I explained Colorado Express Consent and ▆▆▆▆▆ chose a chemical test of his breath. I completed a search of ▆▆▆▆▆ person incident to arrest.



I transported ███ to the Loveland Police Department to complete the chemical test. At approximately 2245 hours, I advised ███ of the 20-minute deprivation period and verified he had nothing in his mouth. While waiting for the Intoxilyzer 9000 to complete the internal check, ███ told me that the machine would show he had nothing to drink. I explained to him that if that were the case, at that time, I would request he submit a blood test. The reason being that blowing zeros would be inconsistent with the impairment that I was seeing. ███ then told me we could just do the blood test then, because he was positive it would come back with nothing.

███ told me that he believed I made a mistake by arresting him tonight, because his balance has been bad lately. ███ said that he has never been diagnosed by a doctor for his balance issues. I explained to ███ that if he blew zeros on the Intoxilyzer 9000 and if his blood came back clean, then the courts would drop the DUI charge. ███ shook his head in agreement. At approximately 2306 hours, ███ supplied two separate breath samples into the Intoxilyzer 9000. The Intoxilyzer 9000 showed he had .000 liters of alcohol per 210 liters of breath.

d. The fact that Sergeant Hill is willing to openly describe these facts indicating the categorical absence of probable cause for her arrest of this man further evidences the fact that Loveland was both aware of this practice and condoned it. It is hard to imagine a better example (besides Plaintiff's perhaps) illustrating the fact of everyone at the Loveland Police Department knowing that their goal is to produce quantity of DUI arrests, not quality DUI arrests.

157. On September 3, 2019, Officer Gates was camped out near the Bear Necessities Smoke Shop in Loveland, looking for people to charge with DUIs. He, like Sergeant Hill, had also just been appointed to the RAID Task Force (they were the two sole delegates from LPD), and he was eager to rack up some DUIs to make his superiors at LPD proud.

a. C.G. had the misfortune of driving by Gates when leaving the parking lot near the smoke shop.

b. Gates initiated a traffic stop on C.G. He claimed that C.G.'s license plate lamp was not sufficiently illuminated.

    c.   C.G. displayed no indications of impairment. Gates falsely alleged he could see bloodshot watery eyes and smell the odor of alcohol.

    d.   C.G. told Gates he was not impaired and cooperated with all of Gates's demands. Gates arrested him for DUI anyway.

    e.   The nature of how cannabis is metabolized in the body is a real problem for innocent people who use cannabis in Colorado; but a boon to arrest-stat-padding officers like Gates. People can smoke cannabis days prior and still have THC appear in their blood when unimpaired. Gates felt confident that since C.G. used cannabis at all, this would be an easy DUI once he got his blood.

    f.   Gates arrested C.G. despite the absence of any indications of impairment (alcohol or marijuana). C.G. submitted to a blood test.

    g.   Months later, the blood test came back negative for alcohol (which as usual Gates had claimed he smelled). Unsurprisingly, there was a trace amount of THC. There was nothing impairing. The prosecutor later dismissed the DUI charge.

158.   On September 30, 2019, Defendant Officer Gates was camped out near the Elk's Club looking for someone to pull over on yet another DUI fishing expedition. K.S. was his next victim. Gates claimed in his report that he could "smell the strong odor of an alcoholic beverage" coming from K.S.

    a.   K.S. told Gates he had had a couple drinks many hours ago and was quite unimpaired and fine to drive. Gates put K.S. through all the Standardized Field Sobriety Tests and claimed that K.S. failed them all. This included Gates claiming that K.S. had "6 out of 6 clues of impairment" on the allegedly scientific Horizontal Gaze Nystagmus test, indicating a BAC over .08.

b. This included K.S. even doing – on scene – a PBT which yielded a result of .042 BrAC. Any BAC under .05 in Colorado is, by law, presumed to be an unimpairing amount. Gates didn't care. He wanted the DUI arrest. So despite seeing this, he arrested K.S.

c. Gates told K.S. he could do a breath test or a blood test. K.S. agreed to submit to a breath test at the station on the certified Intoxilyzer machine. The results on the certified machine were even lower. They came back at .028. Gates was undeterred. Just like he did with Mr. Elias, he demanded next that K.S. submit to a blood test.

d. The blood test came back months later. It showed no impairing substances. The DA dismissed the DUI charges.

159.    On October 19, 2019, Sergeant Hill was on her usual hunt for DUI arrests and she saw D.C.'s car drive by without a front plate attached. She pulled him over.

a. When she reached D.C.'s window, she saw that he had his license plate propped upon his dash. He explained that the front license plate frame was broken and so had had to improvise, placing the plate on his dash, while waiting for the new plate mount he had ordered to arrive in the mail. Hill ridiculed him for not going to get the part at an auto parts store instead.

b. D.C. had shown zero signs of impairment but that did not deter Hill from her mission. She claimed she could smell the odor of both alcohol and marijuana coming from D.C.

c. D.C. told her he was not impaired and had not been drinking or smoking but Hill carried on. She put D.C. through all the roadside tests and declared he had failed them. She arrested D.C. for DUI.

d. D.C. agreed to a blood test.

e.   Months later, the results came back. Negative for alcohol with just a trace of THC (consistent with use some time in the previous week – inconsistent with impairment). The DA dismissed the case.

160.   On November 13, 2019, Sergeant Hill was again out looking for DUIs, camped out by a bar. She saw 70-year-old P.W. go by. She claimed that he failed to signal and pulled him over.

a.   P.W. showed no signs of any impairment. He acted like a normal 70-year-old.

b.   Hill ordered him out of his car and put him through roadside tests anyway.

c.   Roadside tests are not validated for detecting impairment in individuals over age 65.

d.   Hill knew this but didn't care. She declared that P.W. had failed all the tests. She arrested him for DUI.

e.   P.W. agreed to do a breath test at the station. There, he blew a .045 BAC, which is presumed unimpairing by law. Sergeant Hill knew she would still get credit for this DUI arrest in her stats (since she had in fact arrested him for DUI prior to doing the test) so she effected the paperwork to ensure she got that credit (she did) and then released P.W. to his wife. She never filed a criminal DUI charge.

161.   On November 22, 2019, Sergeant Hill was off in Fort Collins working for RAID trying to rack up some more DUI arrests for LPD. T.G. went by with a headlight out. She pulled him over.

a.   T.G. showed no signs of impairment. Hill interrogated him about past alcohol consumption. He admitted to one beer earlier in the day, thus sealing his fate.

b.   Hill claimed she could smell a strong odor of alcohol. She put T.G. through all the roadside tests and declared he failed them. She even falsely claimed that T.G. had "6

out of 6 clues of impairment" on the allegedly scientific Horizontal Gaze Nystagmus test, indicating a BAC over .08.

    c.  Hill arrested T.G. and told him to pick a blood or breath test. He selected blood.

    d.  Months later, his results came back. He was, like the others, innocent. His BAC was a .02. The DA dismissed the case.

162.  On December 22, 2019, Defendant Officer Gates stopped B.M. because her car swerved a single time on the road. B.M. told Officer Gates that the swerve was the result of her being distracted to look at her GPS.

    a.  Officer Gates claimed in his report that he could smell "the strong odor of an alcoholic beverage coming from her breath." Gates claimed she had "bloodshot, watery eyes." As usual, neither of these claims were true. She did the Standardized Field Sobriety Tests and he naturally claimed she failed them all. He arrested her for DUI.

    b.  Officer Gates told B.M. that she would need to do either a blood or a breath test. She chose a blood test. After the blood test, he asked her if she would do a PBT. She obliged him. Gates saw that she was under the legal limit. But he didn't care. He wanted the DUI arrest number. He deliberately left the PBT result out of his report and (hoping the blood would turn up more helpful in terms of maybe some drug or medication) he charged her with DUI.

    c.  Months later, her blood results came back. .028 BAC and negative for everything else. Another wrongful DUI arrest. The DAs office dismissed the DUI charges.

163.  On March 7, 2020, Gates stopped B.T. B.T. showed no signs of impairment but Gates claimed he could smell the "strong" odor of alcohol from B.T.'s breath. He ordered B.T. out of the car to be interrogated and do roadside tests. B.T. complied.

    a.  B.T. did Gates's Horizontal Gaze Nystagmus test (4 or more "clues" on this is supposed to be 89%+ certainty that the individual is more than a .1 BAC) and Gates falsely claimed 6 out of 6 clues.

    b.  B.T. did a portable breath test on scene and Gates refused to say what the result was. He arrested B.T. and charged him with DUI.

    c.  B.T. selected a blood test. Months later the results came back. He was under the limit, at a presumed unimpairing amount. His case was dismissed.

164.    On May 3, 2020, Sergeant Hill stopped K.M. K.M. did not show any signs of impairment but he admitted to smoking cannabis several hours earlier, sealing his fate. She ordered him out of the car to do roadside tests.

    a.  In the process of interrogating K.M. Hill also obtained an admission from him to drinking one drink several hours earlier.

    b.  Hill thus then claimed she could smell the strong odor of alcohol and the strong odor of cannabis from K.M. She ran him through roadsides and claimed that he failed them all. She arrested him for DUI. She told him his only option was a blood test. K.M. complied.

    c.  Months later, the results came back. There were not impairing amounts of any substance in K.M.'s blood. The prosecutor later dismissed the case.

165.    On May 9, 2020, Emily Dutka, an active duty military member, mother of two, and daughter of a Fort Collins Police officer, was driving home in a rental car (she was about to be deployed again). Unbeknownst to Ms. Dutka, one of the rental car's headlights was out.

    a.  LPD DUI Officer Antolina Hill pulled her over. Dutka told her that it was a rental car and she didn't realize the headlight was out. Hill ignored the explanation and

immediately announced she could smell alcohol. Dutka explained that the odor was not from her, but that she had just driven a passenger home who was so drunk that at one point she had to pull over for him to throw up.

b. Hill didn't care for the explanation. As soon as she had an odor and an admission to coming from a place where there was drinking, that was good enough.

c. Hill ran Dutka through all the roadsides and falsely claimed to see "4 of 6 clues of impairment" on the purportedly scientific Horizontal Gaze Nystagmus test she did on Ms. Dutka. On video, Dutka appears completely sober, normal, and without even the slightest indication of impairment.

d. Hill was not to be deterred. She needed to meet her superiors' expectations for high numbers of DUI arrests. She arrested Ms. Dutka and took her for a blood draw.

e. Ms. Dutka's life was destroyed by the DUI arrest. It derailed her military career (they refused to deploy her until the case was resolved) and devastated her marriage. Two months later, the blood results came back. The BAC was .02. She was innocent. The DA immediately dismissed the case.

166.   On August 27, 2020, Hill was again camped out near a bar looking for quick DUI arrests to pad her stats. Her next victim was C.G. She pulled him over, claiming he was going 45 mph in a 35 mph zone.

a. C.G. showed no signs of impairment whatsoever. However, when Hill asked him about drinking, he was honest and said one drink earlier.

b. Hill announced that C.G.'s eyes were bloodshot and watery and that he smelled like alcohol. She ordered him out of the car to do roadsides. He complied.

    c.  C.G. explained to Hill he was not impaired and that he had even waited an extra 20 minutes after the restaurant closed to ensure he was safe to drive home. Hill was undeterred. She put him through the roadside tests and declared that he failed them all.

    d.  Hill arrested C.G. for DUI and put him in handcuffs. She told him he needed to take a blood or breath test. He selected blood.

    e.  Months later, the blood results came back. Like the others before him, C.G. was quite innocent. His BAC was .02. The DA dismissed the case.

167.  On September 3, 2020, Hill was again out and about looking for DUI arrests. She noticed B.F.'s car weave over a line one single time. She stopped him.

    a.  B.F. showed no signs of impairment however he admitted to cannabis use 3 days prior to the stop. That was enough for Hill.

    b.  Hill ordered B.F. out of the car to do roadsides. She declared that he smelled like alcohol and cannabis and that he had bloodshot watery eyes. None of this was true.

    c.  B.F. continued to show no signs of impairment and Hill arrested him for DUI anyway. He did a blood test.

    d.  Months later, the results came back. B.F.'s blood was negative for everything. The DUI dismissed the case.

168.  On November 10, 2020, Defendant Loveland was emailed by MADD (Mothers Against Drunk Driving) asking if they could send a camera crew to do a ride-a-long with one of LPD's DUI officers for a documentary they were making.

    a.  Chief Ticer immediately jumped at the opportunity and agreed. He did not consider even for a moment whether the rights of the people being stopped by his DUI officers would be violated by such an operation, or the perverse incentives this would provide

to the ride-a-long DUI officer to ensure that some DUI arrests were made for the film crew to capture.

b.   One such victim was A.M. On November 20, 2020, LPD DUI Officer Antolina Hill parked near a bar and waited for vehicles to leave so she could stop them and ensure good film content for the MADD team and Texas Pictures production company film crew accompanying her.

c.   Of course, everyone leaving a bar is not impaired. But that wasn't going to stop Sergeant Hill. Chief Ticer had promised MADD in emails that he would "ensure the ride-a-longs to support MADD" and their documentary project. Hill stopped A.M. with the film crew and began a baseless DUI investigation. She ordered A.M. out of the car.

d.   A.M., an ICU nurse who had just dropped her daughter off for work at the bar (and appeared on video sober as ever), got increasingly nervous. She knew she was innocent but Hill seemed hellbent on arresting her for DUI. Then A.M. saw the film crew behind Hill. They had been filming Hill's interaction with, and accusations of A.M., without A.M.'s notice or consent.

e.   A.M. asked who the heck was filming her. Hill sheepishly replied that they were "with MADD." A.M. said she did not want them filming her. Hill permitted them to keep filming A.M.

f.   "I don't want them filming me, why are they still filming me??" A.M. asked. Hill ignored her and tried to redirect her to doing roadside tests. A.M. was not so easily distracted. "I feel like you are violating my privacy rights," she said. "I need help, I need to call a family member," she said.

g.  In response, Hill arrested her and put her in handcuffs. She put A.M. in her partner's
car and then went back to the Texas Productions and MADD film crew in her car. She
then proceeded to falsely list for them a few "impairment indications" she had seen in
A.M. which she claimed would justify the arrest, sharing personal details about A.M.
as she did so. She proudly noted that she had observed "6 out of 6 clues" of impairment
on the Horizontal Gaze Nystagmus test done on A.M. which meant that A.M. was going
to have a BAC over .08.

h.  A.M. did a blood test. She sobbed and had a panic attack while she did so. She told Hill
she was making a mistake and the mistake was going to cost her her career and her
family. Hill told her to "get herself together." Two months later she received the results.
A.M.'s blood level was under the limit. She was innocent. The DA dismissed the case.

i.  MADD used the footage of Hill's wrongful arrest of A.M. in their promotional videos
anyway.[7]



Ten experienced law enforcement officers from eight states address the typically unspoken
deterrents to enforcing impaired driving laws.

Uploaded 7 months ago   283 Views | 0 Likes | 0 Comments          # vimeo.com/560576094

---

[7] See 1:40 mark of the third video in the "MADD Roll Call" Video Series, accessible at:
https://vimeo.com/channels/1695972/560576094

j.   After Hill provided this arrest footage opportunity to MADD and was featured in several of MADD's promotional videos, MADD Colorado awarded her the "2021 Outstanding Individual Dedication to Impaired Driving Enforcement" Award.

k.   Chief Ticer also gave an interview to MADD's film crew for their documentary film series. He is featured throughout several of their promotional videos. A few months later, MADD Colorado awarded his RAID task force the "2021 Outstanding Team Dedication to Impaired Driving Enforcement" Award.

169.   On December 3, 2020, Sergeant Hill stopped M.N. for speeding. She began interrogating him about past alcohol and drug use. M.N. grew very nervous from the accusations. He told her that he had not used cannabis in years and had not drank a thing.

a.   Hill continued interrogating M.N. about marijuana use, stating she didn't believe him and that he needed to be honest and change his answer about cannabis use. This really upset M.N. He told her he was innocent and that the whole encounter was insane.

b.   Hill made M.N. do roadsides and falsely claimed he failed them. She arrested him for DUI. Then she started going through his car looking for some evidence she could use to support her (knowingly) baseless arrest of this poor man.

c.   She eventually found a vape pen inside a console of his car. It was a tobacco vape pen but Hill made sure to insinuate in her report that it was a marijuana vape pen.

d.   M.N. did a blood test. He was extremely upset and distressed about Hill falsely arresting him. He demanded to talk to her supervisor and told the supervisor he was going to sue the department. They all laughed in his face about it.

e.   Months later the results came back. M.N.'s blood was negative for everything. The DA dismissed the case.

170.    On February 3, 2021, Hill stopped H.K. She said she could smell marijuana. H.K. was not showing any signs of impairment but admitted there was a joint in the car, sealing his fate. H.K. explained that he had not smoked recently and was just doing deliveries for Doordash.

    a.   Hill arrested him for DUI anyway. He chose a blood test.

    b.   Months later, the results came back. Negative for everything. The DUI was dismissed.

171.    On March 2, 2021, Gates and Hill tag-teamed C.R. together for a wrongful DUI arrest. C.R. was not showing signs of impairment but she did admit in response to the officers' interrogation that she was prescribed medications for her Bipolar disorder, thereby sealing her fate. The officers asked when she had last drank alcohol and she told them less than one drink hours earlier. Both then claimed they could smell the "strong" odor of alcohol.

    a.   Gates and Hill also claimed that C.R. had 4 of 6 clues on the Horizontal Gaze Nystagmus test along with failing the other sobriety maneuvers.

    b.   C.R. did not appear impaired at all. They arrested her for DUI anyway. She complied with a blood test.

    c.   Months later, the results came back. C.R. was innocent and her BAC was .02. There were no impairing substances present. The DA dismissed the case.

172.    On September 30, 2021, Hill stopped P.C. He showed no signs of impairment, but Hill claimed she could smell marijuana. P.C. never had a chance.

    a.   Hill interrogated P.C. at length about alcohol and drug use. He admitted to a drink earlier in the day. Hill immediately claimed she could smell a strong odor of alcohol and failed roadsides. She arrested him for DUI.

    b.   P.C. did a blood test.

    c.   Months later, the results came back. Negative for all impairing substances. The DA dismissed the case.

## NO CONSEQUENCES, ONLY AWARDS

173.    No officer at LPD has ever been disciplined for making a wrongful DUI arrest.[8]

174.    No officer at LPD has even been directed to complete additional training as a result of their wrongful DUI arrests.

175.    Instead, LPD rewards those individuals who get the most DUI arrest numbers, regardless of whether those arrests are lawful or not.

176.    Chief Ticer proudly reports those DUI arrest numbers to agencies like MADD to ensure he and his "DUI specialist" officers (Gates and Hill) get more awards and recognition that he can take personal credit for.

---

[8] In fact, even when confronted with clear evidence of his officers' wrongful DUI arrests, Ticer still goes to the media and gives public statements supporting the misconduct and stating that he believes all his officers' arrests (including that of Mr. Elias in this case) are always made on "solid probable cause." See "Motorists Say Cops Wrongfully Arrested Them for DUIs When They Were Sober," *Inside Edition*, March 9, 2022, accessible at: https://www.insideedition.com/motorists-say-cops-wrongfully-arrested-them-for-duis-when-they-were-sober-73716

177.    Here's a picture of Ticer doing just that a couple weeks after Gates's wrongful arrest of

Mr. Elias: (from left to right – Ticer, Hill, Gates (holding the trophy)):



178.    LPD has given both Hill and Gates repeated recognition and rewards and praise for the

quantity of DUI arrests that they make. Particularly in the year leading up to Mr. Elias's arrest,

when its Chief Ticer had just accomplished the formation of his RAID task force (which would

bring substantial additional funding to the Loveland Police Department, as well as justification

to do more press releases patting themselves on the back for their DUI enforcement efforts).

179.    Because they know that making DUI arrests (whether lawful or not) is the way to advance

and succeed at the Loveland Police Department, Gates and Hill have done so prolifically, with

reckless disregard and deliberate indifference to the constitutional rights of Colorado citizens.

180.    In the year leading up to his wrongful arrest of Mr. Elias, Officer Gates's traffic stop and

DUI arrest numbers were so absurdly high, and so exponentially greater than the rest of LPD

officers (combined), that any reasonable supervisor would have recognized that Gates was likely engaged in misconduct and repeated violations of the constitutional rights of citizens. Any reasonable supervisor would have seen Gates's traffic stop and DUI arrest numbers as a huge red flag requiring investigation, intervention, and supervision.

181.    Officer Gates was engaged in a number of patterns that should have alerted any reasonable supervisor to the near-certainty of him repeatedly violating citizens' constitutional rights. Neither Gates's supervisor Hill nor other supervisory staff up the chain of command through Chief Ticer did anything to stop Officer Gates, however, because they in fact all fully supported it pursuant to LPD's policy of valuing DUI arrest quantity statistics over the civil rights of innocent Coloradoans.

182.    It was not just Officer Gates's DUI arrest numbers that ought to have alerted Sergeant Hill and other supervisory personnel at LPD to the fact of him plainly and repeatedly violating citizens' constitutional rights in pursuit of the highest possible DUI arrest stats. But Officer Gates's *quantity of traffic stops* was also a huge red flag, especially when compared to other patrol officers.

    a.   In 2019, the average total number of traffic stops initiated by other LPD patrol officers working similar shifts to Officer Gates was roughly 200-400/year.

    b.   In 2019, **Officer Gates initiated 1,622 traffic stops**. This quantity of stops is literally light years beyond what any other similarly situated officer (in any police department) could possibly do lawfully.

    c.   How did Gates have the time to do this then? The answer is in the percent of drivers that Gates released with no citation. In 2019, of his 1,622 traffic stops, Gates let 1,352

of those drivers off with a warning (no ticket at all). **That works out to a catch-and-release rate of 84%**.

d.  No reasonable officer anywhere releases 84% of the drivers they stop for traffic violations. But Gates did, and quite deliberately. Why? Because writing tickets <u>takes time</u>. And Gates was only interested in padding his DUI arrest stats. So he engaged in a systematic fishing expedition on the surrounding population, looking solely for the opportunity to make another DUI arrest.

e.  The thousands of citizens Gates was stopping did not know it, but he was never pulling them over to actually enforce the traffic code. Rather, he was always only pulling them over to conduct random DUI investigations. If he smelled an odor or the driver wasn't immediately forthcoming and cooperative, he would arrest them for DUI. He did not care about reasonable suspicion. He did not care about probable cause. He did not care about enforcing other traffic laws. The only thing that Gates cared about was padding his DUI arrest stats to make his supervisors and Chief Ticer happy.

f.  Chief Ticer was very happy.

g.  Gates's stop and arrest numbers were extremely compelling evidence of a pattern of constitutional rights violations. Neither Hill nor supervisory staff at LPD did anything to stop it. They instead rewarded and praised it because they knew how important it was to the LPD to value DUI arrest numbers over all else.

h.  Defendant Hill engaged in a similar catch-and-release strategy to conduct DUI fishing expeditions on the Loveland community. She just did so a little less blatantly. In 2019, **Defendant Sergeant Hill released with a warning 63% of the people she stopped**.

i.   Examination of the data of traffic stop numbers and what percent are released with a warning for younger/newer officers at LPD reveals that this unconstitutional dragnet-DUI-investigation approach is both modeled and taught. The most ambitious officers at LPD tend to increase the number of people they let go with a warning and no ticket considerably every single year. There are multiple new officers at LPD who as of last year had gotten their catch-and-release percentages up to match that of Gates and Hill, **by releasing with no ticket over 80% of the drivers they stopped**. Those drivers that they actually did ticket were disproportionately relegated to DUIs.

j.   Some officers at LPD in some years **charged more than 30% of the people they stopped and gave citations to with DUI**.

k.   This data further evidences the LPD's policy of valuing DUI arrests numbers over all else, with the foreseeable result including countless wrongful DUI arrests.

183.   Everyone in LPD knows about Gates's and Hill's numerous wrongful DUI arrests and arrests of innocent people. But because of the culture and customs deliberately cultivated at Loveland, Gates and Hill are actually, absurdly, *admired* by their colleagues for having such high arrest numbers. Their peers are in fact *envious* of the praise and accolades Ticer and LPD supervisory personnel continue to heap upon them for their arrest stats, despite all the lives of innocent people they have ruined in pursuit of those stats and accolades.

184.   LPD even goes as far as to openly and proudly participate in *timed DUI arrest competitions* put on by MADD to increase their own fundraising and lobbying efforts (as of this writing, MADD is reporting over $20M raised for itself in 2019).

185.   For example, Loveland participates in "48-hour challenges" to see which agency can get the most DUI arrests. Naturally, since they have no problem arresting innocent people, Loveland wins these competitions all the time.



186.   LPD then posts about their victories in these absurd arrest competitions all over their social

media, continuously reaffirming to all Loveland police officers, including Defendants Gates

and Hill, that DUI arrests are valued over all else, especially citizens' constitutional rights.



187.   It has become unsafe for innocent people to drive on Loveland roads during certain hours

of the day due to the risk of being wrongfully charged with DUI. Especially late at night, there

are too many Loveland police officers patrolling, with only one objective (make DUI arrests)

with too few drivers to prey on.

188.   LPD has obtained hundreds of thousands of dollars of grant funding for themselves as a result of their DUI arrest numbers. They have used this funding to buy themselves more equipment and hire more officers. With more equipment and more officers, they are able to make more arrests and then point to those arrest stats as "proof" of rising crime levels that they then proclaim requires more funding, equipment and officers to solve. Without intervention, this self-serving scam will continue and the wake of innocent citizens whose lives are destroyed by it will continue to grow.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
42 U.S.C. § 1983 – Unlawful Arrest Without Probable Cause – Individual, Failure-to-Supervise/Train and *Monell*
Violation of Fourth Amendment, Due Process
(against Defendants Gates, Hill and Loveland)
**GATES**

189.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

190.   The actions of Defendant Officer Gates as described herein, while acting under color of state law, intentionally deprived Mr. Elias of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including his right to be free from unlawful seizure as guaranteed by the Fourth Amendment to the Constitution of the United States of America and 42 U.S.C. § 1983, in that Mr. Elias was arrested without a warrant and without probable cause to believe he had committed any offense.

191.    Defendant Officer Gates knew that Mr. Elias was unimpaired and that he had no probable cause to arrest him and he did so anyway, with deliberate indifference to Mr. Elias' rights under the Fourth Amendment to the U.S. Constitution.

192.    Officer Gates's arrest of Mr. Elias was objectively unreasonable in light of the facts and circumstances confronting Officer Gates before, during and after this encounter.

193.    Gates's conduct described herein was attended by circumstances of malice, or willful and wanton conduct, which he must have realized was dangerous, or that was done heedlessly and recklessly, without regard to the consequences or the rights and safety of others, particularly Plaintiff.

194.    Defendant Officer Gates falsified his reports regarding evidence of impairment to ensure that Plaintiff would be prosecuted for the DUI offense he had not committed.

195.    Defendant Officer Gates caused Plaintiff to be arrested without probable cause or a warrant, and his false statements in his report caused Plaintiff to be wrongly subjected to criminal prosecution. Defendant Gates's actions were done with malice and caused Plaintiff damages.

**HILL**

196.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

197.    The actions of Defendant Sergeant Antolina Hill as described herein, while acting under color of state law, intentionally deprived Mr. Elias of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including his right to be free from unlawful seizure as guaranteed by the Fourth Amendment to the Constitution

of the United States of America and 42 U.S.C. § 1983, in that Mr. Elias was arrested without a warrant and without probable cause to believe he had committed any offense.

198.    At the time of Gates's wrongful arrest of Mr. Elias, Sergeant Hill was the on-duty supervisor with the responsibility for supervising Gates' conduct and intervening to correct any misconduct.

199.    Officer Gates told Sergeant Hill that Mr. Elias had blown all zeroes and that he had made him do a blood test anyway to see if anything else was present. Gates described what he was doing to Hill as the fishing expedition that it was, and he did so in a boastful way because he knew it was behavior that she would approve of and that she regularly modeled and engaged in herself.

200.    Hill reviewed and signed off on Gates's affidavit for warrantless arrest of Mr. Elias. She read the document which she knew to be false and devoid of facts supporting probable cause and which documented Gates's ongoing wrongful seizure of Mr. Elias. She approved of it, and of Gates's report, thus ensuring that the wrongful seizure and criminal prosecution of Mr. Elias would continue as well.

201.    Hill was personally familiar with Gates's history of other wrongful DUI arrests prior to his arrest of Mr. Elias. Rather than intervene to prevent further such wrongful arrests, she approved of and encouraged such wrongful DUI arrests. Hill knew the Loveland policy and practice just like everyone else at LPD: DUI arrest numbers were paramount.

202.    Sergeant Hill's prior acts of ratifying and encouraging Gates's reckless and wrongful DUI arrests, her own practice of modeling the same, and her failure to supervise him in a manner to prevent such foreseeable resulting repeated civil rights violations by Gates, caused Gates to have no hesitation in making his wrongful DUI arrest of Mr. Elias.

203.    Further here, Hill was personally involved in the continuation of Mr. Elias's arrest and the wrongful criminal prosecution against him. Gates informed her, in real time, of what he was doing to Mr. Elias, and she failed to intervene.

204.    Defendant Sergeant Hill had ample opportunity to stop Gates from continuing his wrongful arrest and prosecution of Mr. Elias. If she had acted, Mr. Elias would never have been wrongfully charged with DUI and most, if not all, of the damages and harms to Mr. Elias that followed thereafter would not have occurred.

205.    Witnessing Sergeant Hill's approval and encouragement of Officer Gates's wrongful arrest and charging of Mr. Elias caused Mr. Elias additional trauma and suffering.

206.    Any officer in Sergeant Hill's position would have looked at Mr. Elias and seen that he was observably unimpaired and indisputably sober. She was informed by Gates himself that he had just blown triple zeroes on the Intoxilyzer. She had all the firsthand information that would have caused any reasonable supervising officer in her shoes to intervene to prevent further harms and losses to Mr. Elias. But she chose not to.

**LOVELAND**

207.    Defendant City of Loveland is a governmental entity and municipality incorporated under the laws of the State of Colorado for purposes of liability under 42 U.S.C. § 1983 and the Loveland Police Department is a department of City of Loveland. Defendant City of Loveland enforces local and state law through its law enforcement agency, the Loveland Police Department ("LPD").

208.    Defendant Loveland had a duty to train and supervise Defendant Officer Gates.

209.   At all times relevant to this Complaint, Defendant City of Loveland employed and was responsible for the promulgation of policies, customs, practices and training of LPD personnel, including Officer Gates.

210.   Defendant City of Loveland was aware of Defendant Gates's propensity for wrongfully arresting citizens to increase his DUI arrest numbers, falsifying his reports, and had evidence of the same, and it chose to not just fail to remedy it, but to instead reward it, ensuring it would continue to occur.

211.   Defendant City of Loveland also had a custom/practice where its officers would punish anyone who refused to be questioned (in violation of their constitutional rights) by arresting them.

212.   Defendant City of Loveland also had a custom/practice of rewarding and valuing DUI arrest numbers over actual lawful DUI arrests, which made the wrongful arrest of innocent individuals like Mr. Elias at the hands of officers like Gates further inevitable.

213.   Both Loveland's failure to supervise and train Gates, as well as its aforementioned unconstitutional customs/practices, were the moving force behind Mr. Elias's wrongful arrest.

214.   Defendant Loveland's actions and omissions violated Plaintiff's federal constitutional rights, and were a substantial and significant contributing cause and proximate cause of Plaintiff's damages.

215.   Defendant Loveland did not act upon a good faith and reasonable belief that their actions and omissions in failing to adequately train and supervise LPD officers in this area was lawful.

216.   The Defendants' conduct proximately caused injuries, damages, and losses to Mr. Elias.

### SECOND CLAIM FOR RELIEF
Section 13-21-131, C.R.S. – Arrest Without Probable Cause
Violation of Colorado Constitution, Article II, Section 7
(against Defendant Gates)

217.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

218.    Defendant Gates was a police officer under Colo. Rev. Stat. § 24-31-901(3), employed by the City of Loveland and LPD at the time he wrongfully seized, arrested and maliciously prosecuted Mr. Elias.

219.    Plaintiff Mr. Elias had a protected interest under the Colorado Constitution, article II, § 7 in being secure in his person from unreasonable seizures by law enforcement personnel.

220.    Officer Gates unreasonably seized and arrested Mr. Elias, in violation of the Constitution of the State of Colorado.

221.    Officer Gates did not at any time during his encounter with Mr. Elias have probable cause or reasonable suspicion or any other legally valid basis to believe that Mr. Elias had committed, was committing, or was about to commit any violation of law.

222.    Officer Gates did not at any time have a warrant authorizing his seizure of Mr. Elias.

223.    Officer Gates violated Mr. Elias's state constitutional rights by engaging in an unlawful seizure of Mr. Elias that was objectively unreasonable in light of the facts and circumstances confronting him before, during and after his encounter with Mr. Elias.

224.    Defendant Gates knowingly violated Mr. Elias's individual rights secured by the bill of rights of the Colorado Constitution.

225.    Defendant Gates did not act upon a good faith and reasonable belief that his actions in seizing Plaintiff without probable cause or reasonable suspicion was lawful.

226.    The acts or omissions of the Defendant Gates were the moving force behind, and the proximate cause of, injuries sustained by Mr. Elias.

227.    Defendant Gates's wrongful arrest and humiliation of Mr. Elias caused him to experience extraordinary stress, expense, depression, terror and anxiety. The experience of this event caused and continues to cause Mr. Elias trauma and emotional distress, loss of any feeling of safety or security, along with other damages and injuries described herein.

**THIRD CLAIM FOR RELIEF**
42. U.S.C. § 1983 – Malicious Prosecution
Fourth Amendment, Due Process Violations
(against Defendants Gates, Hill)

228.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

229.    Defendant Gates caused the criminal prosecution against Mr. Elias by falsifying and deliberately exaggerating the facts in his report in an effort to make it more likely to appear there had been probable cause for Mr. Elias's arrest, and providing those documents to the District Attorney.

230.    Defendant Sergeant Hill personally assisted Gates with this endeavor.

231.    Defendant Officer Gates' false allegations were the sole moving force behind the criminal prosecution against Mr. Elias.

232.    Defendant Gates's actions were done with malice.

233.    No probable cause supported the criminal charges Gates brought against Mr. Elias.

234.   The criminal prosecution against Mr. Elias resolved in his favor with the Larimer County Court dismissed the case against him on March 3, 2020.

235.   Defendant Gates's malicious and false prosecution of Mr. Elias caused him to suffer further trauma, damages, lost wages, suffering, depression, and despair.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including but not limited to:

a.   Declaratory relief and injunctive relief, as appropriate;

b.   Actual economic damages as established at trial;

c.   Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, trauma, fear, anxiety, loss of enjoyment of life, loss of liberty, loss of sense of security, and other non-pecuniary losses;

d.   Punitive or exemplary damages for all claims as allowed by law in an amount to be determined at trial;

e.   Issuance of an Order mandating appropriate equitable relief, including but not limited to:

   i.   Issuance of a formal written apology from each Defendant to Plaintiff;

   ii.   The imposition of appropriate policy changes designed to avoid future similar misconduct by Defendants;

   iii.   Mandatory training designed to avoid and prevent future similar misconduct by Defendants;

   iv.   Imposition of disciplinary action against appropriate employees of Loveland;

f.  Pre-judgment and post-judgment interest at the highest lawful rate;

g.  Defendant Gates's surrender and physical forfeiture to Plaintiff of the DUI Award trophy that he obtained by violating Plaintiff's constitutional rights;

h.  Attorney's fees and costs; and

i.  Such further relief as justice requires.

### VII. REQUEST FOR TRIAL BY JURY

Plaintiff requests a trial to a jury on all issues so triable.

Respectfully submitted this 30th day of March, 2022.

THE LIFE & LIBERTY LAW OFFICE

*s/ Sarah Schielke*
Sarah Schielke
Counsel for Plaintiff
The Life & Liberty Law Office LLC
1209 Cleveland Avenue
Loveland, CO 80537
P: (970) 493-1980
F: (970) 797-4008
E: sarah@lifeandlibertylaw.com


### CERTIFICATE OF SERVICE

This is to certify that on March 30, 2022 a true and accurate copy of the foregoing *Amended Complaint* has been sent to the following parties by PACER/ECF:

Jonathan Abramson, Esq.
Yulia Nikolaevskaya, Esq.
Kissinger & Fellman, P.C.
3773 Cherry Creek North Drive, Suite 900
Denver, CO 80209
Email: jonathan@kandf.com
julie@kandf.com
*Attorneys for Defendants Gates, Hill and Loveland*

*/s/ Sarah Schielke*