IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-00644-RMR-NYW

HARRIS ELIAS,

     Plaintiff,

v.

CITY OF LOVELAND, a Colorado municipality,
OFFICER WILLIAM GATES, Loveland Police Officer, in his individual capacity, and
SERGEANT ANTOLINA HILL, Loveland Police Officer, in her individual capacity.

     Defendants.

---

## PLAINTIFF'S RESPONSE TO DEFENDANTS' PARTIAL MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT [ECF 23]

---

Plaintiff Harris Elias, by and through his attorney, files this *Response to Defendants' Partial Motion to Dismiss Plaintiff's Amended Complaint and Jury Demand [ECF 23]*, and in support of the same respectfully submits as follows:

### INTRODUCTION

This is a civil rights action arising from the unlawful arrest and malicious prosecution of the Plaintiff Harris Elias by the City of Loveland ("the City") and its police officers. The allegations in the amended complaint – which at this stage of the proceedings are presumed to be true – paint a detailed and disturbing picture of an overzealous Police Department trained and deliberately led to charge innocent people like Plaintiff Mr. Elias with wrongful DUIs for sport, money, and bragging rights. The allegations are not conclusory or broad; they are detailed, directly relevant, reflect statistics and outside agency investigations, and are the product of the

1

synthetization of thousands of pages of *still incomplete* data obtained by Plaintiff's counsel through, (among many sources): open records requests, Colorado Criminal Justice Records Requests, and from previous client accounts, over the preceding multiple years.

Mr. Elias's amended complaint is able to describe how the Loveland Police department and its defendant officers have accomplished their perverse goals of increasing their own revenue and obtaining actual (literal) trophies by means of knowingly, recklessly, and repeatedly violating the constitutional rights of the citizens they encounter. Plaintiff Mr. Elias was one such victim of the Defendants' lawless scheme. Incredibly, unlikely most Plaintiffs who attempt to make *Monell* and supervisory claims in the § 1983 context, he actually has quite a bit more than a hunch. In fact, he has extensive, detailed evidence of the pattern/practices driving the constitutional violations he experienced. Sixty-two pages of it. Despite these realities, the City of Loveland still attempts a 12(b)(6) Motion to Dismiss Mr. Elias's claims against the municipality and supervisors who incentivized, rewarded, directed, and personally participated in the misconduct which caused the constitutional violations and his injuries. Respectfully, the Defendants' *Motion* must be denied.

## STANDARD OF REVIEW

To state a claim, a plaintiff's complaint must "show[] that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2). This means that the plaintiff must allege enough factual matter, taken as true, to make his "claim to relief . . . plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). "This is not to say that the factual allegations must themselves be plausible; after all, they are assumed to be true. It is just to say that relief must follow from the facts alleged." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008)). "If a complaint explicitly alleges

every fact necessary to win at trial, it has necessarily satisfied this requirement. If it omits some necessary facts, however, it may still suffice so long as the court can plausibly infer the necessary unarticulated assumptions." *Id.*

## RELEVANT FACTUAL BACKGROUND & OVERVIEW

The following facts, taken from Mr. Elias' amended complaint and jury demand, are presumed true for purposes of the Defendants' partial motion to dismiss: On January 4, 2020, when driving home after a pleasant, law-abiding evening with his family, a perfectly sober Plaintiff Harris Elias had the misfortune to be pulled over by Defendant William Gates, an aggressive City of Loveland police officer with a track record (known to the Loveland Chief and his supervisor Defendant Sergeant Hill) of false DUI arrests. (ECF 12, ¶¶64-66). Gates subjected Mr. Elias to this unlawful seizure and detention even though Mr. Elias had committed no traffic offense or otherwise engaged in any criminal activity. (ECF 12, ¶¶ 15-25, 34-36, 46). During the stop, Gates made knowingly false claims about Mr. Elias's driving and an "overwhelming odor of alcohol" (which he had done with other innocents before, and which here again, did not exist) for purposes of concealing his wrongful detention. (ECF 12, ¶¶ 26-27, 37-38). When Mr. Elias produced his license and proof of insurance without any indication of impairment and told Gates he was not going to answer his questions, Gates then continued to make false allegations, fabricated evidence, ordered Mr. Elias to exit his vehicle, violated written policies concerning body-worn cameras, and arrested Elias, knowing full well that there was no probable cause to believe that Mr. Elias had committed a criminal offense. (ECF 12, ¶¶ 40-48, 51-54, 56-63). Gates did so purposefully, with deliberate indifference to Mr. Elias' clearly-established Fourth and Fourteenth Amendment rights, and as part the Loveland Police Department's ("LPD") custom and practice – encouraged by its

supervisory officers – of arresting people who exercise their constitutional right to refuse to submit to its officers' authority and questioning. (ECF 12, ¶¶ 48-49, 64-66). Plaintiff's Complaint details more than 5 separate instances of this particular custom/practice in just the two-year period surrounding Mr. Elias's arrest. (ECF 12, ¶¶ 48-50).

After the arrest, Gates transported Mr. Elias to the Loveland police station, where Mr. Elias elected to take a breath test, the results of which showed a 0.000% blood alcohol content ("BAC"). (ECF 12, ¶¶ 67-71). Despite this proof of innocence, Gates continued his unlawful seizure of Mr. Elias in order to continue an unsubstantiated fishing expedition and, while muting his microphone in contravention of written policies, announced to other LPD officers his intentions to force Mr. Elias to now submit to a blood test. One of the other officers snickered and came over to watch the show. (ECF 12, ¶ 72). Under threat of losing his license, Mr. Elias gave in to this unlawful coercion and consented to the lawless and highly intrusive blood draw,[1] while Gates next began threatening and mocking Mr. Elias in an effort to provoke any kind of reaction out of the innocent Mr. Elias that Gates could misconstrue in his report as impairment-related belligerence . (ECF 12, ¶¶ 79-85). He was unsuccessful in doing so. (Id.) Gates then transported Mr. Elias in handcuffs back to the station and told him the only way he could avoid being jailed for the rest of the night was to find a sober driver to pick him up at 2 am in the morning. (ECF 12, ¶ 86).

---

[1] The United States Supreme Court has recognized that blood tests are highly intrusive: "[b]lood draws are 'significant bodily intrusions,'" as they "require piercing the skin," "extract a part of the subject's body," and "place[] in the hands of law enforcement authorities a sample that can be preserved and from which it is possible to extract information beyond a simple [BAC] reading." *Birchfield v. North Dakota*, 579 U.S. 438, 463-64 (2016); *see also Missouri v. McNeely*, 569 U.S. 141, 148 (2013) (referring to a blood draw as "an invasion of bodily integrity" that "implicates an individual's 'most personal and deep-rooted expectations of privacy'").

At the station, while Mr. Elias's unlawful detention continued, Gates conferred with his direct, on-duty supervisor, Defendant LPD Sergeant Antolina Hill. Gates told Hill that Mr. Elias had blown all zeroes. (Id. at ¶87). Gates told Hill how he had made Mr. Elias submit to a blood test, to see if he could get him for any medications or something else. (Id.) Hill nodded in agreement and approval, as this was exactly what she did in this situation too – continue the fishing expedition and never give up the DUI arrest. (Id.) Both Hill and Gates knew that Loveland/Ticer rewarded (and in fact, demanded) that officers make as many DUI arrests as possible, without regard for the actual evidence, and that Loveland/Ticer had never once punished a wrongful DUI arrest. (Id.) Hill was Gates's supervising Sergeant with command authority over him, and he looked to her for confirmation and direction. (Id. at ¶¶88-89). Hill next reviewed Gates's report filled with claims she knew were false about Mr. Elias and personally approved it, ensuring Mr. Elias's criminal prosecution and continued detention. (ECF 12, ¶¶ 90, 194, 200, 203-205, 230). Just like Gates, Hill did this because (a) she knew that the City had policies and practices that rewarded DUI arrests numbers above all else (even if the "facts" to be alleged in support of the arrest had to be manufactured) and because she knew the City not only tolerated but *encouraged* Fourth Amendment violations when people refused to be interrogated. (ECF 12, ¶¶ 201-202, 230, 232). To boot, as a supervisor, she encouraged those policies and practices by her subordinates and personally herself engaged in and perpetuated such practices. (Id.)

Two months after this unlawful search and seizure of Mr. Elias's blood, the results came back completely negative for alcohol, drugs, medications, or other controlled substances, and Mr. Elias' criminal case was dismissed in its entirety. (ECF 12, ¶¶ 103-04).

LPD, its Chief Ticer, and Hill knew about Gates's (and Hill's) propensity for wrongful DUI arrests of innocent motorists, but did nothing about it. (ECF 12, ¶¶ 119-122, 139-142, 153-184, 210). In fact, they happily encouraged it. That's because the City has had a policy, custom, pattern, and practice of wrongfully arresting innocent people who exercise their constitutional rights not to be interrogated by LPD officers and manufacturing criminal charges against them, as illustrated by numerous instances since May 31, 2019 in which LPD officers – including but not limited to Gates, Hill, and Ticer – have done exactly that,[2] sometimes using brutal and excessive force, often falsifying evidence or lying outright to cover-up their misdeeds, with the City's records department meanwhile deliberately making open records requests prohibitively expensive, and frequently failing to comply with legitimate requests for information. (ECF 12, ¶¶ 1-2, 12-13, 28-29, 48-49, 78, 87-89, 109-111, 113-122, 129-148, 152-172, 178-183, 210-212). Loveland has revealed and Mr. Elias has also pleaded a policy of aggressively and persistently emphasizing, incentivizing, and awarding DUI arrests above all other policing activities. (ECF 12, ¶¶ 125-129, 133-139, 173-181, 183-186). Throughout this cacophony of misconduct, the City has observed repeated and regular red flags with respect to specific officers (like Defendants Gates and Hill) revealing the need for training and supervision when it comes to people's constitutional rights. (Id.) In the face of those red flags and obvious rights violations, Loveland has done nothing but insist its officers make *more* arrests. (ECF 12, ¶¶ 125-129, 133-139, 173-181, 183-186). This is

_____

[2] It is not coincidence that most of the evidence of this practice Mr. Elias has been able to uncover thus far is more recent than his own arrest. As it happens, Loveland had only implemented bodyworn cameras on its officers a mere seven months prior to Mr. Elias's arrest. See, e.g., Peter, H., "Loveland police officers don body cameras," *Loveland Reporter-Herald* (May 31, 2019) available at: https://www.reporterherald.com/2019/05/31/loveland-police-officers-don-body-cameras/

because Loveland PD has been able to obtain significant monetary grants, funding, resources, and awards by racking up high quantities of DUI arrests. No one at Loveland or at the institutions giving Loveland money/awards has ever penalized the wrongful arrest of innocent people, so LPD has since (now former) Chief Robert Ticer's arrival in 2016 engaged in the repetitive and perpetual violations of the civil liberties of citizens like Mr. Elias. (ECF 12, ¶¶ 30-33, 87-88, 122-128, 141, 173-177, 184-186, 188). Their customs, practices and policies have made it unsafe for innocent people, like Mr. Elias, to drive on Loveland roads at certain times, especially late at night, and were the moving force behind the wrongful arrest and violations of Mr. Elias's constitutional rights. (ECF 12, ¶¶ 187, 213).

## ARGUMENT

### I. Mr. Elias' amended complaint sufficiently alleges claims upon which relief can be granted against the City and Sergeant Hill.

Mr. Elias has plainly adequately pled claims against Gates under 42 U.S.C. § 1983 for wrongful arrest and malicious prosecution and Defendants do not claim otherwise in their Motion to Dismiss. Defendants instead contend that Mr. Elias has not pleaded sufficient facts in support of his claims against Loveland under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), or against Sergeant Hill for her personal participation in Mr. Elias's wrongful arrest and malicious prosecution. Defendants' arguments are conclusory, confusing, and rely on repeated efforts to dispute pleaded facts. Mr. Elias has more than adequately pleaded his claims against the Defendants and their Motion to Dismiss must fail.[3]

---

[3] Defendants also contend that the state constitutional right cause of action Mr. Elias pleaded against Gates pursuant to §13-21-131, C.R.S. must fail for concerns of retroactivity. Mr. Elias's § 13-21-131 claim is based on the same operative facts as his § 1983 claim for unreasonable search and seizure, however, which is unchallenged. It would not alleviate Defendant Gates of any of the

**A.      The City's 12(b)(6) challenges that Mr. Elias' *Monell* claim are without merit.**

**1.      *Monell* Standards**

To establish liability under *Monell*, a plaintiff must show "(1) the existence of a municipal custom or policy, and (2) a direct causal link between the custom or policy and the violation alleged." *Hollingsworth v. Hill*, 110 F.3d 733, 742 (10th Cir. 1997). There are five different types of municipal liability. They are:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotation and alteration marks omitted); *see also Hinkle v. Beckham Cty. Bd. of Cty. Comm'rs*, 962 F.3d 1204, 1239 (10th Cir. 2020).  Plaintiff has actually alleged facts supporting all five types of municipal liability. He has detailed a scheme of profit and promotion wherein Loveland PD employees are rewarded for baseless DUI arrests, expected to arrest anyone who does not immediately capitulate to their questioning, and where absolutely no one in any supervisory capacity imposes consequences for the repeated wrongful arrests of citizens that they are observing their subordinates make.

---

burdens of litigation if that state claim were dismissed, and whether § 13-21-131 (which created a remedy for state constitutional right violations) applies to state constitutional right violations prior to its passage on June 19, 2020 remains an open question. It may not matter here, but Mr. Elias will nevertheless provide responsive argument to that contention at the end of this Response.

"Pleading a municipal policy, custom, or practice is like pleading the breach element of negligence – which is also ultimately a question of fact for the jury." *Griego v. City of Albuquerque*, 100 F.Supp.3d 1192, 1213 (D. N. Mex. Apr. 11, 2015). Although ordinarily a plaintiff must demonstrate a pattern of similar constitutional violations by untrained employees in order to satisfy the deliberate indifference standard, "in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference." *Id.* (citing *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). Deliberate indifference may be found "if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations." *Id.*, quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998), citing *Brown*, 520 U.S. at 409; *see also Canton*, 489 U.S. at 390 and n.10.

### 2.    The factual evidence available to Mr. Elias underlying his *Monell* claims has been quite adequately pleaded.

The City contends broadly that "nothing in the Amended Complaint nudges *Monell* allegations against the City from conceivable to plausible" and, apparently viewing paragraphs 208-213 in a vacuum separate from the other two hundred paragraphs of factual averments in the complaint, argues that Mr. Elias "failed to outline how the City had evidence of Officer Gates' alleged propensity, who at the City was aware of such evidence, and how the City failed to remedy the issue." (ECF 23, pp.13-14). These contentions are inaccurate. As set out above and in the complaint itself, and despite the City's continual obfuscation and prohibitively expensive practices in responding to open records requests for information, Mr. Elias's amended complaint outlines in

exacting detail how LPD Chief Ticer and Sergeant Hill knew or should have known about Gates' propensity, and how Ticer likewise knew or should have know about Hill's similar propensities, and how Ticer even once himself participated in his own wrongful DUI arrest with her – with Ticer alleging after his lengthy DRE (Drug Recognition Expert) evaluation of Hill's arrestee that the driver was "impaired by cannabis."[4] (ECF 12, ¶¶ 112-148, 151-172).

Defendants' claim that Mr. Elias hasn't adequately defined what he means by "DUI arrest numbers" and "lawful DUI arrests" is bizarre and unproductive. (ECF 23, p.14). Their suggestion that Mr. Elias "never specifically alleged who at the City possessed this specific information and how the City was specifically aware of it" ignores the repeated factual allegations regarding how Chief Ticer not only knew about, but himself was involved in, unlawful arrests and the promotion of DUI arrests at all costs in order to obtain greater funding for the LPD. (ECF 12, ¶¶ 118-122, 173-188). These factual allegations are then further substantiated in Mr. Elias's Complaint with reference to the Jensen Hughes' investigative findings actually identifying at LPD a "culture focused on traffic enforcement and DUI arrests" with a quota system of 10 citations expected per day. (ECF 23, ¶¶134-37).

Defendants broadly contend that Mr. Elias has not adequately alleged any unconstitutional custom and/or practice. (ECF 23, pp.16-20). This contention is also inaccurate. Mr. Elias' amended complaint specifically alleges, in multiple places, that LPD has had a policy and custom of violating the Fourth and Fourteenth Amendment rights of innocent citizens by arresting people who refused to be interrogated. (ECF 12, ¶ 48 ("And LPD had a custom for the treatment of any person who refused to submit to their authority and questioning: They would be arrested."); ¶¶ 49-

---

[4] The driver's blood test came back negative for alcohol, all drugs, and, of course, cannabis.

50, 78, 111, 211). Plaintiff provides multiple examples of this practice – across different contexts, by different officers, over an extremely short time period (less than 2 years). (Id.) Defendants appear to forget the "basic – and itself uncontroversial – principle" that "to punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort,'" *see United States v. Goodwin*, 457 U.S. 368, 372 (1982) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)), and for a state actor "to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional.'" *Bordenkircher*, *supra* (citing *Chaffin v. Stynchcombe*, 412 U.S. 17, 32-33, n.20 (1973)).

Similarly, Defendants contend that Mr. Elias's complaint only cites to five previous wrongful DUI arrests at the hand of Gates, and they then proceed to resort to arguing factual disputes with respect to those wrongful DUI arrests. (ECF 23, pp.18-20). The purpose of Rule 12(b)(6) is not to resolve factual disputes, but simply "to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Grove v. Skyline Machine & Supply Inc.*, 2006 WL 2982634, *1 (D. Colo. Oct. 17, 2006) (citations omitted.). Tellingly, Defendants completely ignore those portions of the complaint that allege numerous other wrongful DUI arrests at the hands of Hill and Ticer himself. (ECF 12, ¶¶ 152, 154, 156, 159-161, 164-172). Defendants also ignore the portions of Mr. Elias's complaint that allege facts such as:

- "No officer at LPD has ever been disciplined for making a wrongful DUI arrest." (ECF 23, ¶173).

- "No officer at LPD has ever been directed to complete additional training as a result of their wrongful DUI arrests." (Id. at ¶174)

- "[W]hen confronted with clear evidence of his officers' wrongful DUI arrests, [chief] Ticer still goes to the media and gives public statements supporting the misconduct" (ECF 23, ¶173, n.8)

- "Gates's traffic stop and DUI arrest numbers were so absurdly high, and so exponentially greater than the rest of LPD officers (combined), that any reasonable supervisor would have recognized that Gates was likely engaged in misconduct and repeated violations of the constitutional rights of citizens." (Id. at ¶180)

- "LPD even goes as far as to openly and proudly participate in timed DUI arrest competitions … [and] since they have no problem arresting innocent people, Loveland wins these competitions all the time." (ID. at ¶¶184-85).

Defendants also ignore the fact that, in this case, Mr. Elias has alleged *not only* policies, customs, and a pattern of unconstitutional violations at the hands of the LPD since 2018, *but also* actions and inactions on the part of the City – including but not limited to the failure to supervise and to train LPD officers – that present "an obvious potential for constitutional violations." *See de la Torre, supra*, citing *Barney*, 143 F.3d at 1308.  Indeed, the wrongful arrest and malicious prosecution of Mr. Elias are the "highly predictable" and "plainly obvious" consequences of the City's policies, customs, actions, and inactions, *id.*, particularly of their policies of rewarding and demanding officers maintain DUI arrest quotas and of never imposing consequences for any of their officers' numerous wrongful DUI arrests. As such, Defendants' complaints about the sufficiency of the "pattern" alleged by Mr. Elias do not amount to much, if anything, given that his allegations, if true, are sufficient to establish deliberate indifference by way of the City's

actions and inactions creating "an obvious potential" for the very constitutional violations Mr. Elias suffered.

Defendants' argument that Mr. Elias failed to adequately plead a direct causal connection between the City's policies or customs and Elias' injuries fares no better. (ECF 23, pp. 20-21). To be sure, it is difficult to imagine a policy that is more "closely related to" or that provides a more "direct causal link" between the wrongful arrest and malicious prosecution of Mr. Elias than the City's widespread practice of arresting or otherwise violating the Fourth Amendment rights of innocent people who exercise their constitutional rights to refuse to submit to questioning. This policy and practice is not, by any stretch of imagination, "facially constitutional." *See supra* at 11 (citing *Goodwin* and *Bordenkircher*). It is the exact opposite. This alone is enough to satisfy Mr. Elias's burden on both the causation and state-of-mind elements. *See Hinkle*, 962 F.3d at 1240-41 (holding the County directly liable for its indiscriminate strip-search policy for detainees, which was "unconstitutional on its face").[5]

The City's other policy and custom of elevating, incentivizing, and awarding DUI arrests over all others for monetary gain and accolades – even if it means encouraging and overlooking false arrests – is not facially constitutional either. Even if it were, Mr. Elias would still satisfy the causation and state of mind elements in this early pleading stage because that custom is both alleged in fact and reasonably plausibly inferred to be closely related to and directly causally linked to the injuries he has alleged. *Id*. at 1241. Notably, to the extent that Defendants are claiming that

---

[5] A municipal policy or custom need not be "unconstitutional" to support municipal liability under § 1983. Rather, a party need only allege facts sufficient to demonstrate that it is plausible (1) that the municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation. *See Jiron*, 392 F.3d at 419.

Mr. Elias's "daydreaming" and unfamiliarity with the town, which resulted in his briefly taking his foot off the gas pedal (ECF 12, ¶ 21), was somehow the direct cause of the injuries he sustained (ECF 23, p.21), they are *conceding* that the constitutional violations alleged, in fact, occurred, given that Mr. Elias's conduct was in no way illegal and did not justify a traffic stop, much less an arrest and criminal prosecution.

Defendants continue to read Mr. Elias's amended complaint selectively to argue that it fails to adequately allege the City failed to train or supervise Gates.[6]  Defendants' claim that Mr. Elias "does not proffer any facts regarding the officers' training or supervision—when it occurred, who conducted it, or how it was deficient" (ECF 23, p.23) is not only incorrect, it is openly disingenuous.  Unlike the plaintiff in *Tivis v. City of Colo. Springs*, 2020 U.S. Dist. LEXIS 42054, *13, 2020 WL 1166842 (D. Colo. March 11, 2020), on which Defendants place great reliance, Mr. Elias's complaint here specifically identifies *both* Chief Ticer and Sergeant Hill as policymakers and supervisors and details specific facts showing how, since 2016, Ticer has not only failed to supervise and train Gates and Hill to enforce the criminal law without needless and repetitive violations of innocent citizens' Fourth Amendment rights, but also incentivized and encouraged their repetitive wrongful arrests of innocent people for money, bragging rights, and lobbying purposes. (ECF 12, ¶¶ 113-42). Plaintiff has alleged facts revealing that the Chief himself personally participated in wrongful DUI arrests, assisted in efforts to cover them up, and created a "toxic culture" that has resulted in this horrific arrest events pattern's persistent continuation. (Id.) These facts are more than sufficient for this Court to find that, at this early stage, Mr. Elias has alleged enough facts to demonstrate that the need for supervision and training is "so obvious" that

a lack of either demonstrates deliberate indifference, *see de la Torre*, at *7, if not broad-scale intentional wrongdoing.

It bears reminding here that in a municipal liability claim, "it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery." *Id.*, citing *Taylor v. RED Dev., LLC*, 2011 WL 3880881, at *4 (D. Kan. Aug. 31, 2011) (quoting *Thomas v. City of Galveston, Texas*, 800 F. Supp. 2d 826, 842 (S.D. Tex. 2011)). "'Accordingly, only minimal factual allegations are required at this stage of the proceedings." *Id.* (quoting *City of Galveston*, 800 F. Supp. 2d at 842-43); *see also Kerns v. Sw. Colorado Mental Health Ctr., Inc.*, 2019 WL 6893022, at *12 (D. Colo. Dec. 18, 2019) (finding that, based on the "asymmetry of available information," the plaintiffs need not plead a failure to train or supervise claim "with greater factual specificity at this time"). Indeed, the very nature of *Monell* claims is that the Defendants will *always* have near complete control over the evidence prior to discovery and thus for this very reason Courts have always granted the most factual pleading latitude to this type of claim for this very reason. *See Arnold v. City of Olathe*, 413 F.Supp.3d 1087, 1112 (D. Kan. 2019) (recognizing plaintiff had not included as many facts for his municipal liability claim as for other claims in the complaint, but noting plaintiff "ha[d] not yet been granted discovery into the policies, practices, and customs that may have resulted in the officers' actions" and holding "at this point in the litigation," plaintiff had alleged a plausible *Monell* claim against the city); *Bledsoe v. Board of County Commissioners*, 501 F.Supp.3d 1053, 1059 (D. Kan. 2020) (same).

In sum, Mr. Elias has provided fair notice to the City on the grounds for which he is suing it and has alleged facts supporting all the elements necessary to establish an entitlement to relief

under *Monell.* At the end of the day, to even academically entertain the arguments made by Defendants in their *Motion to Dismiss*, the reader has to ignore vast swaths of Mr. Elias's well-pleaded amended complaint while also weighing in on and resolving – without the benefit of discovery – dozens of factual disputes Defendants attempt to raise. Neither practice is appropriate for deciding something as elementary as whether the plaintiff has failed to state a claim upon which relief can be granted.

> **B.** **Defendant Hill's arguments that Elias failed to allege supervisory liability on Hill's part as to the "unlawful seizure" claim or a viable malicious prosecution claim against her are also without merit.**

> **1.** **Unlawful Seizure**

Hill characterizes Mr. Elias's claim against her as "an individual capacity supervisory liability claim." (ECF 23, p.8). This is only partly correct. Mr. Elias is suing Hill based on theories of *both* personal and supervisory liability. *See Brown v. Montoya*, 662 F.3d 1152, 1163-64 (10th Cir. 2011) ("A § 1983 defendant sued in an individual capacity may be subject to personal liability and/or supervisory liability"). Hill's personal liability is based on her personal involvement and participation in the constitutional violations alleged. Her supervisory liability stems not only from her personal involvement and deliberate acts as a supervisor, but also from her promulgation, implementation, encouragement, and modeling of the policies and practices that caused Mr. Elias to be subjected to Gates' unlawful seizure and arrest.

Although Defendants argue that Hill had no personal participation in Mr. Elias's arrest, the facts described above and in the amended complaint tell a different story. While it is true that Hill was not personally involved in Gates' unlawful stop and initial arrest of Elias, she nevertheless trained and modeled this wrongful DUI arrest behavior to Gates, and she had direct personal

involvement in Mr. Elias's arrest process and his continuing detention while at the station. In close

proximity to Mr. Elias at the police station, Hill muted her camera to confer[7] with Gates as his

supervisor and, during this conference, Gates revealed that even though Mr. Elias had blown all

zeroes, he had still forced Mr. Elias to submit to a blood draw. Although Mr. Elias was observably

unimpaired and indisputably sober, Hill not only encouraged, ratified, and approved of Gates'

unlawful course of conduct and failed to intervene, she then personally and actively participated

in the arrest process and ongoing illegal seizure by reviewing and approving Gates' arrest reports

and helping him write them in a manner she thought would be more persuasive. Hill did this

knowing full well that Mr. Elias was completely sober and that there was no probable cause to

believe that he had driven under the influence of alcohol. Gates literally told her. In her capacity

as Gates' supervisor, Hill had an obligation and opportunity to intervene to stop this wrongful

seizure and arrest, but she did not do so.

These actions of deliberate misconduct and deliberate indifference by Hill resulted in Mr.

Elias's continued illegal confinement and set in motion a series of events – namely, his wrongful

prosecution – that Hill knew or reasonably should have known would further deprive Mr. Elias of

his constitutional rights. Taken as true, these facts are sufficient to show supervisor liability, *i.e.*

---

[7] It is interesting that Defendants claim that Plaintiff's allegations regarding Hill's/Gates's conversations are "uncorroborated speculation" that the Court should summarily "disregard" because "the body cameras were muted." (ECF 23, p. 9, n.6). Not only were there other LPD officers present (with their own BWCs still recording) when these conversations took place, but Mr. Elias himself was personally able to overhear much of what the officers discussed. It is some level of boldness on the part of Defendants to proclaim in a 12(b)(6) motion to dismiss that Plaintiff's factual allegations about what Defendants said when they conspired to violate his rights are allegations which ought to be summarily disregarded by the Court prior to any case discovery because of how thorough the Defendants themselves believe they were in destroying all evidence of those conversations by muting.

to show that Hill "personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance," which is all that the law requires. *Hinkle*, 962 F.3d at 1226.

Defendants' contention that Hill's conduct had no causal connection to the constitutional violations alleged also falls short. Defendants once again overlook the facts alleged in Mr. Elias's complaint that Hill was a policymaker, a supervisor, and the LPD's "queen" of DUI arrests, that she had shown Gates and others the model for false DUI arrests, and that she had personally encouraged the practice (and benefitted from it). Defendants want this Court – prior to any discovery – to declare that this conduct had no causal connection to Gates's wrongful arrest of Mr. Elias and the malicious prosecution that followed. That is not the Court's role in resolving a 12(b)(6) motion. The Court's role in resolving a 12(b)(6) motion is to evaluate whether Plaintiff has merely plausibly pleaded that causation in his complaint. He has.

### 2. Malicious Prosecution

The elements of malicious prosecution are: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was no probable cause to support the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages. *Novitsky v. City of Aurora*, 491 F.3d 1244, 1257-58 (10th Cir. 2007). The facts as alleged in Mr. Elias's amended complaint, presumed true, meet all of these elements and, therefore, are sufficient to state a valid malicious prosecution claim against Hill. Defendants' arguments for dismissal of this claim focus solely on Mr. Elias's initial arrest, and fail to address Hill's role in Mr. Elias's continued confinement and prosecution. As pled in the complaint, "Hill could have told Gates to release Mr. Elias and not charge him with DUI, given that he had blown zeroes and there was no evidence of

any other drug. She was his supervising sergeant and had command authority over him. But she didn't. She didn't care. And with how many wrongful DUI arrests she herself was making during this time (see infra) it sure wouldn't hurt if some other LPD officers were making their own, too." (ECF 12, ¶89). And then, of course, Mr. Elias has also pleaded: "Hill then assisted Gates in writing his report of this arrest and approved of it as his supervisor." (ECF 12, ¶90). Plaintiff has pleaded *both* supervisory liability and personal involvement on Hill's part with respect to the malicious prosecution claim.

### C. Application of the remedy afforded by § 13-21-131, C.R.S. to the facts alleged in Plaintiff's Complaint is not impermissibly retrospective.

Section 13-21-131, C.R.S. was part of omnibus legislation in Senate Bill 20-217, which Colorado's General Assembly passed for the purpose of "enhanc[ing] law enforcement integrity." The Bill Summary states that "[t]he act allows a person who has a constitutional right secured by the bill of rights of the Colorado constitution that is infringed upon by a peace officer to bring a civil action for the violation." SB 20-217. Section 3 of SB 20-217 provided the statute in question, which states in pertinent part that "[a] peace officer . . . employed by a local government who, under color of law, subjects or causes to be subjected, including failing to intervene, any other person to the deprivation of any individual rights that create binding obligations on government actors secured by the bill of rights, article II of the state constitution, is liable to the injured party for legal or equitable relief or any other appropriate relief." § 13-21-131(1) (2022), C.R.S. Unlike other parts of SB 20-217 which had delayed effective dates, section 3 took effect immediately upon passage (June 19, 2020).

Defendants argue that Mr. Elias's claim for violation of his rights under the state constitution should be dismissed because, they argue, § 13-21-131 did not state it was

"retroactive." Plaintiff respectfully disagrees with this characterization of the cause of action at issue. The constitutional rights secured to Colorado citizens under Article II of the Colorado Constitution have always existed; what did not exist, until the passage of SB 20-217, was a monetary damages remedy to enforce violations of those rights. The Colorado Supreme Court in *Bd. of Cty. Comm'rs of Douglas Cty. v. Sundheim*, 926 P.2d 545, 548 (Colo. 1996), expressly referred to the prospect of recovering for state constitutional violations as a "remedy" that, at that time, it noted, did not currently exist. In *Sundheim*, the Court declined to recognize a judicially-created state remedy for a state constitutional violation, and stated that the Colorado state legislature had not yet acted on this. With the passage of § 13-21-131, the Colorado legislature has acted, and its act was not to create a new cause of action or substantive right, but rather to provide a remedy for those who have suffered violations of their long-existing state constitutional rights.

In Colorado, applying new legislation retroactively is not presumptively unconstitutional, but rather is permitted in certain instances. *Ficarra v. Dep't of Reg. Agencies*, 849 P.2d 6, 11 (Colo. 1993). Colorado courts use the term "retrospective" to describe retroactive legislation that is unconstitutional and to distinguish it from legislation that may properly be applied retroactively. Retroactive application is permitted where the statute effects a change that is "merely procedural or remedial in nature." *Kuhn v. State*, 924 P.2d 1053, 1057-78 (Colo. 1996). This is because "a change in remedy does not constitute the impairment of a vested right, 'for there is no such thing as a vested right in remedies.'" *Id.* at 1057 (quoting *Continental Title Co. v. District Court*, 645 P.2d 1310, 1315 (Colo. 1982). To determine whether a statute is permissibly retroactive rather than unconstitutionally retrospective, the Colorado Supreme Court has established this test:

(1) did the legislature intend the statutory provision to apply retroactively? And

(2) if the intent is established, then the statute is unconstitutionally retrospective if it:

    a.   impairs a vested right; or

    b.   creates a new obligation, new duty, or attaches a new disability.

*See In re Estate of DeWitt*, 54 P.3d 849, 854 (Colo. 2002). Retroactive application of a statute is permitted when it effects a change that is merely procedural or *remedial*. *Id.* A change in remedy does not constitute "impairment of a vested right" because there is no such thing as a vested right in remedies (or lack thereof). *See Continental Title Co.*, 645 P.2d at 1350 ("The abolition of an old remedy, or the substitution of a new one, neither constitutes the impairment of a vested right nor the imposition of a new duty, for there is no such thing as a vested right in remedies."); *see also Kuhn*, 924 P.2d at 1056-57. Just like 42 U.S.C. § 1983, section 13-21-131, C.R.S. is not itself a source of substantive rights, but a method for vindicating rights elsewhere conferred. It is a remedial vehicle.

Section 13-21-131(5) states that "a civil action pursuant to this section must be commenced within two years after the cause of action accrues." This plain language indicates that Colorado's General Assembly intended the violation of the state constitutional right to trigger application of the statute, and that the statutory remedy for violations of state constitutional rights is available for two years thereafter. Certainly, if Colorado's legislature did not want this two-year backwards period to apply retroactively, it would have said so. Instead, it passed a statute that was effective immediately and which by its own terms provides a remedy for violations of state constitutional rights within the preceding two years.

In any event, given that this is a novel issue of first impression sounding exclusively in state law currently being litigated across state and federal courts, this Court can simply defer a

ruling on this particular issue since the underlying nucleus of facts for this claim against Gates for violating Mr. Elias's rights under Article II, section 7 of the Colorado Constitution mirrors that of the § 1983 claim brought against Gates for violating Mr. Elias's rights under the Fourth Amendment. Rushing to conclusions on the retroactivity of the state statute here while the question continues to be litigated and developed elsewhere (including the state courts) would not serve any practical purpose at this stage. It would also carry the risk of creating splits and inconsistent interpretation of the law within this District. If the Court elects to exercise supplemental jurisdiction over the state claim, there is nothing gained in this case by rushing to resolve a novel question that ultimately will have to be resolved by an appellate state court. Dismissal of the state constitutional violation claim at this early stage of deferential 12(b)(6) review, based on a questionable interpretation of a state statute, in a case where dismissal of such a claim would not fundamentally impact or alter the trajectory of the case or the discovery being conducted therein, would thus be imprudent.

## CONCLUSION

Mr. Elias has adequately pleaded constitutional violations by both Defendants Hill and Loveland in abundant (and at times excruciatingly) plausible detail. Respectfully, the Defendants' motion to dismiss is without merit and should be denied.

Respectfully submitted this 5th day of July 2022.

/s/ Sarah Schielke
Sarah Schielke
The Life & Liberty Law Office LLC
1209 Cleveland Avenue
Loveland, CO 80537
P: (970) 493-1980
E: sarah@lifeandlibertylaw.com
Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

This is to certify that on July 5, 2022, a true and accurate copy of the foregoing *Motion* has been sent to the following parties by PACER/ECF:

Jonathan Abramson, Esq.
Yulie Nikolaevskaya, Esq.
Kissinger & Fellman, P.C.
3773 Cherry Creek North Drive, Suite 900
Denver, CO 80209
Email: jonathan@kandf.com
julie@kandf.com
*Attorneys for Defendants William Gates,*
*Antolina Hill and the City of Loveland*

*/s/ Sarah Schielke*